STARN ● O'TOOLE ● MARCUS & FISHER
A Law Corporation

TERENCE J. O'TOOLE          1209-0
ANDREW J. LAUTENBACH  8805-0
KUKUI CLAYDON (10378-0)
733 Bishop Street, Suite 1900
Pacific Guardian Center, Makai Tower
Honolulu, Hawaiʻi 96813
Telephone: (808) 537-6100
Email: totoole@starnlaw.com;
          alautenbach@starnlaw.com;
          kclaydon@starnlaw.com

ALIOTO LAW FIRM [*Pro Hac Vice* Applications Forthcoming]
JOSEPH M. ALIOTO (SBN 42680)
TATIANA V. WALLACE (SBN 233939)
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Email:  jmalioto@aliotolaw.com
          twallace@aliotlaw.com

Attorneys for Plaintiffs
WARREN YOSHIMOTO; KRISTIN BARROGA;
SEAN KETTLEY; CAROLYN FJORD;
DON FREELAND; DON FRY;
BILL RUBINSOHN; CLYDE D. STENSRUD

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WARREN YOSHIMOTO; KRISTIN BARROGA; SEAN KETTLEY; CAROLYN FJORD; DON FREELAND; DON FRY; BILL RUBINSOHN; CLYDE D. STENSRUD,<br><br>                    Plaintiffs, | Case No. 1:24-cv-00173<br><br>**COMPLAINT TO PROHIBIT THE ACQUISITION OF HAWAIIAN AIRLINES, INC. BY ALASKA AIRLINES INC., IN VIOLATION OF THE CLAYTON ANTITRUST ACT, 15 U.S.C. § 18**<br>*(caption continued on next page)* |

v.

ALASKA AIRLINES, INC.;
ALASKA AIR GROUP, INC.

                    Defendant.

_____

**COMPLAINT TO PROHIBIT THE ACQUISITION OF HAWAIIAN
AIRLINES, INC. BY ALASKA AIRLINES INC., IN VIOLATION OF THE
CLAYTON ANTITRUST ACT, 15 U.S.C. § 18**

Plaintiffs WARREN YOSHIMOTO, KRISTIN BARROGA, SEAN
KETTLEY, CAROLYN FJORD, DON FREELAND, DON FRY, BILL
RUBINSOHN, and CLYDE D. STENSRUD (collectively "**Plaintiffs**"), by and
through their undersigned counsel, bring this Complaint to Prohibit the Acquisition
of Hawaiian Airlines, Inc. ("**Hawaiian**" or "**Hawaiian Airlines**") by Alaska Airlines
Inc. and Alaska Air Group Inc. ("**Alaska**" or "**Defendant**") in violation of the
Clayton Antitrust Act, 15 U.S.C. § 18.

**OVERVIEW**

1.     *Alaska's proposed acquisition of Hawaiian not only violates federal
law because it may "substantially lessen competition or tend to create a monopoly"
in multiple markets in the passenger airlines industry[1], but it could also threaten
Hawaiʻi's economy and the well-being of Hawaiʻi's people.*

_____

[1] Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18) provides in pertinent part
as follows: "No person engaged in commerce or in any activity affecting commerce
shall acquire, directly or indirectly, the whole or any part of the stock or other share
capital . . . where in <u>any</u> line of commerce or in <u>any</u> activity affecting commerce in

### *Hawai'i's People and Hawai'i's Economy Depend on Stable and Predictable Air Travel*

2.      Unlike all other States, Hawai'i depends almost entirely on air travel for its residents, visitors, and economy.  A loss, or lessening, of airline capacity could be geographically and/or economically disabling for Hawai'i in ways that any other mainland destination in the United States would not experience.  There are other modes of transportation to and from all destinations in the other 49 states.  Not so with Hawai'i, where the only other inbound and outbound mode of transportation is by ship - a totally impracticable alternative that hearkens back to the steamship era 100 years ago.

3.      Healthy, stable and predictable airline capacity is absolutely essential to Hawai'i's economy and its residents.  Travel and tourism deliver almost $20 billion in revenues to Hawai'i – representing approximately 27% of Hawai'i's total economy measured in dollars.[2]  Airlines currently deliver over 9 million visitors annually to Hawai'i,[3] generating almost $10 billion in lodging, another $4 billion in

---

any section of the country, the effect of such acquisition *may* be substantially to lessen competition, or tend to create a monopoly." (Emphasis added).

[2]  https://www.statista.com/statistics/187859/gdp-of-the-us-federal-state-of-hawaii-since-1997/.

[3]  A total of 9,233,983 of visitors came to Hawai'i in 2022.  Of those, 98.9% (9,138,674) visitors arrived by air, and only 1% (95,309) visitors arrived by cruise lines.  See Department of Business Economic Development and Tourism 2022 Annual Visitor Research Report (DBEDT) at p. 2, available at https://www.hawaiitourismauthority.org/media/11448/2022-annual-report-final3.pdf.

food and beverage, over $2 billion in transportation, and additional hundreds of millions in conventions and other indirect business. Stable and predictable inter-island airline connections are spokes of this important economic wheel.

### *Alaska Airlines Acquisition of Hawaiian Airlines May Lessen Competition in Violation of Federal Law and May Threaten Harm to Passengers, Hawai'i, and Its Economy*

4. Because of Hawai'i's unique geographic location and its travel/tourism-based economy, a loss of airline competition in key Hawai'i-related markets due to airline consolidation could be catastrophic to Hawai'i and may have significant anti-competitive ripple effects. Alaska Airlines acquisition of Hawaiian Airlines may have such probable effects causing labor layoffs, higher prices, less frequent flights interisland, from Hawai'i to the mainland, and from Hawai'i to Asia and Pacific.

5. Federal anti-trust law seeks to enjoin further consolidation of an already heavily consolidated and concentrated airline industry where the effect of such consolidation "*may be to lessen competition*." The most recent example of a court striking down a similar acquisition, is the January 16, 2024, decision of the United States District Court, District of Massachusetts, in <u>United States of America et al v. JetBlue Airways Corporation, and Spirit Airlines</u>, Civil No. 23, 10511-WGY, 2024 WL 162876 (D. Mass, 2024) where the court permanently enjoined the acquisition of Spirit Airlines by JetBlue.

6.      The <u>JetBlue</u> decision is notable for its lucid analysis of the Clayton Antitrust Act where Congress's fundamental goal was "to arrest the trend toward concentration, the tendency to monopoly…. before the consumer's alternatives disappear [ ] through merger".[4]  Congress therefore "sought to assure … the courts the power to brake this force at its outset and before it gathered momentum".[5]

7.      As the <u>JetBlue</u> court noted, Congress used the words "**may be to substantially lessen competition** … to indicate that its concern was with **probabilities**, not certainties"[6] (emphasis added).  Here, the strong probability, if not certainty, is that Alaska's acquisition of Hawaiian could substantially lessen competition and otherwise harm Hawai'i in the following ways:

*(1) Control over the Hawai'i- Mainland Market*:  Hawaiian and Alaska are the second a third largest providers of Hawai'i-U.S. mainland capacity at present, behind United.  United has a 23.5% capacity share.  Hawaiian has 23.2% and Alaska has 16.9%.  By acquiring Hawaiian, Alaska would have over 40% capacity share for Hawai'i -U.S. mainland routes and become the largest airline for those routes.[7]  The acquisition may allow Alaska to limit or eliminate flights, raise fares, add ancillary

---

[4] <u>United States v. Philadelphia Nat'l Bank</u>, 374 U.S. 321,367 (1963).
[5] <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 317-18 (1962).
[6] <u>F.T.C. v Hackensack Meridian Health, Inc.</u>, 30 F.4th 160,166 (3rd Cir. 2022).
[7] More like 48% to West Coast States.  https://airserviceone.com/alaska-airlines-hawaiian-would-have-40-of-hawaii-mainland-us-capacity-but-compete-on-just-12-routes/

fees, lessen services, and effectively control 40% of the seat capacity traffic between Hawaiʻi and the US mainland.

(2) *Overlapping Mainland Markets*:  Not only could Alaska gain a 40% share of the mainland market, but it could also eliminate Hawaiian as a competitor in twelve specific routes.  Hawaiian currently serves fifteen destinations non-stop (via 28 separate flights to include different departure airports) on the U.S. mainland, and Alaska serves twenty-four.  ***Twelve of Alaska and Hawaiian's flights between the U.S. mainland directly overlap***.  Alaska's acquisition of Hawaiian would eliminate competition between these two carriers on these routes.

(3) *Alaska's Control of the Hawaiʻi-Mainland Market Could Significantly Impact Hawaiʻi's Almost $20 Billion Travel/Tourism Industry*:

a. <u>85% of Hawaiʻi Visitors Come from the Mainland Markets</u>:  In 2022, of the 9,138,674 visitors to Hawaiʻi, approximately 85% (7,746537) came from the U.S. mainland.  Of this number, approximately 60% (5,277,349) came from the U.S. West and 27 % (2,469,128) from the U.S. East.

b. <u>Alaska's Acquisition of Hawaiian Could Give It Significant Control Over Hawaiʻi's Travel/Tourism Industry</u>:  By definition, Alaska's control over 40% of the Hawaiʻi-Mainland market may give it significant control and influence over Hawaiʻi's $20 billion travel/tourism industry.

*(4) Control of Interisland Service:*  Hawaiian is the largest provider of interisland service in Hawai'i, holding a 67% achieved market in interisland flights—a market that Alaska is seeking to buy into, rather than compete into.

*(5) International Destinations*:  Hawaiian offers flights to ten international destinations across seven countries in the Pacific and Asia, none of which are served by Alaska—these are additional markets that Alaska is seeking to buy into, rather than compete into.  The Japan market is critical to Hawai'i's economy.

*(6) Other Significant Direct Impacts and Threatened Harm Which May Result in a Lessening of Competition from Alaska's Acquisition of Hawaiian.*

 a. <u>Hawaiian's Contribution to the local Hawai'i Economy</u>:  In 2022, Hawaiian spent $1.6 Billion in Hawai'i.[8]  Over time, Hawaiian's employees and resources may be eliminated, and may move to Alaska's headquarters in Seattle or elsewhere.  This significant level of spending may diminish and perhaps disappear.

 b. <u>Elimination of Hawaiian's Oahu Headquarters</u>:  The proposed acquisition could eliminate Hawaiian's headquarters on Oahu and leave the brand subject to absentee ownership with no meaningful connection to Hawai'i:  Alaska Airlines isn't even based in Alaska; it operates out of Seattle.

---

[8] https://www.civilbeat.org/2023/03/hawaiian-vs-southwest-good-news-for-travelers-bad-news-for-the-bottom-line/.

c.  <u>Likely Loss of Local Jobs</u>:  Hawaiian employs 7,200 individuals, most of which are Hawaiʻi residents.[9]   As with every acquisition, the acquiring company may cut costs, including jobs – particularly where those jobs may be redundant or duplicative, or no longer needed by reason of the elimination of competition.

d.  <u>Hawaiian's Connection and Contributions to the Community May Be Lost:</u>  In 2018, Hawaiian supported 284 non-profit organizations through cash donations, in-kind donations to 501(c)3s, and the Hawaiian Airlines Foundation.  Between 2013 and 2018, Hawaiian donated more than $2 million to local charities and non-profits.

e.  <u>Loss of Hawaiian's Culture and Aloha Spirit</u>:  Unlike any other airline, Hawaiian embodies the culture and spirit of its origin State, Hawaiʻi, its people and its land.  Every passenger who boards a Hawaiian flight immediately knows that they are on a "Hawaiian" airline – from the logo on the tail that honors "Pualani" and the hospitality she represents, to the aloha spirit of the crew.  Once the acquisition is complete, "Hawaiian" may be nothing more than a brand name, which Alaska may dispose of at some future date when the name no longer serves its

---

[9] <u>See</u> https://www.hawaiianairlines.com/careers/working-with-us#:~:text=Our%207%2C000%2B%20employees%20are%20honored,the%20rest%20of%20the%20world.

purpose, as Alaska did after acquiring Virgin America and having promised not to abandon the brand.

## The History and Legacy of Hawaiian Airlines

8.      Since 1929, Hawaiian Airlines has been a source of pride for the State of Hawaiʻi and has deep roots in the Islands.  Prior to its founding in 1929, Hawaiʻi residents and visitors travelled by steamship—Hawaiian was the first to introduce interisland air service, taking passengers between the islands and working to get its customers accustomed to the novelty of flying.  In 1941, Hawaiian was the first company to connect Hawaiʻi to the Continental United States by air.

9.      Hawaiian has continued to build on its legacy.  Generations of Hawaiʻi residents and visitors have flown Hawaiian, and generations of Hawaiʻi residents have worked, and continue to work, for Hawaiian.  Hawaiian is, in fact, the largest private employer in the State of Hawaiʻi, and employs over 7200 people, of which approximately 5800 are union employees.  With its headquarters on Oahu, Hawaiian remains in tune with what is happening locally in a way that only a local carrier can. For those living in Hawaiʻi, having an airline based in Honolulu with international, mainland and interisland routes has long provided a sense of pride, and of Aloha spirit.

10.      Hawaiian is also a hugely visible brand that contributes meaningfully to the local community, including by sponsoring large events, awarding grants to

nonprofits, and helping to evacuate people after the August 2023 Lahaina fire. Hawaiian often partners with other local organizations, and boasts that:

> Hawai'i is our home. At Hawaiian Airlines, we feel that it is our kuleana to support the local businesses and organizations that fuel the economy of these beautiful islands. We are proud to offer our kokua through donations, volunteering and offering locally made products in flight to spotlight businesses here in Hawai'i.[10]

11.     After 95 years in business, Hawaiian continues to serve as the primary carrier between Hawai'i and the mainland for residents of Hawai'i, the primary interisland carrier, and a significant provider of key routes to Asia and the Pacific. Hawaiian's purpose is to connect people with Aloha, and to safely bring them closer together. Consistent with this mission, Hawaiian offers its travelers flexibility to travel when it's most convenient, by, among other things eliminating exchange fees. And Hawaiian's reward program boasts "Hawaiian Miles" that never expire and are redeemable for free flights and a wide variety of benefits.

12.     As further alleged herein, and as the data shows, Alaska's proposed acquisition of Hawaiian could eliminate Alaska's main competition between Hawai'i and the US mainland including 12 specific overlapping flights. This elimination of competition may have the following anticompetitive effects: eliminate flights, raise fares, charge ancillary fees, lessen services, and effectively control 40% of the seat capacity traffic between Hawai'i and the US mainland. The

---

[10] https://www.hawaiianairlines.com/about-us/why-fly-hawaiian.

proposed acquisition could also give Alaska control over one of just two carriers that provide interisland flights in Hawaiʻi and allow Alaska to buy its way into the Pacific and Asia market, without having to compete for a share of said market.

13.    The proposed acquisition violates Section 7 of the Clayton Antitrust Act and should be enjoined.

## **INTRODUCTION**

14.    This is private antitrust action brought under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) charging that the acquisition of Hawaiian by Alaska violates Section 7 of the Clayton Antitrust Act, seeking an Order of the Court prohibiting the proposed elimination of Hawaiian by Alaska, as a violation of the antitrust laws.

15.    The proposed acquisition of Hawaiian for $1.9 Billion[11] by Alaska is a violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 12-27 ("**Clayton Antitrust Act**"), in that the effect of the elimination of Hawaiian may be "substantially to lessen competition or tend to create a monopoly" in multiple markets in the passenger airlines industry.[12]   This lessening of competition by the

---

[11] This includes $.09 Billion of Hawaiian's outstanding adjusted net debt.

[12] Section 7 of the Clayton Antitrust Act provides in pertinent part as follows: "No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital . . . where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition *may* be substantially to lessen competition, or tend to create a monopoly." (Emphasis added).

elimination of Hawaiian constitutes irreparable injury and harm because a major competitor is eliminated.

16.    Hawaiian and Alaska are the second and third largest providers of flights between Hawaiʻi and the US mainland.  As of December 2023, United had a 23.5% capacity share, with Hawaiian at 23.2% and Alaska at 16.9%.  Based on current schedules (and ignoring any acquisition effects) the proposed acquisition will make Alaska account for more than 40% of all airline seat capacity on Hawaiʻi-US mainland routes, significantly more than the current number one, United Airlines, and make Alaska the largest airline in Hawaiʻi.

17.    Hawaiian serves fifteen destinations non-stop on the U.S. mainland, and Alaska offers twenty-four.  ***Twelve of Alaska and Hawaiian's flights to the U.S. mainland directly overlap***.

18.    Hawaiian is the largest provider of interisland service in Hawaiʻi, achieving a 67% market share in interisland flights—a market that Alaska is seeking to buy into, rather than compete into.  This comes just shortly after Alaska eliminated its substantial competitor on the West Coast by acquiring Virgin America in 2017.

19.    Alaska now dominates the West Coast corridor and serves the same cities as Hawaiian on numerous overlapping direct flights.[13]

---

[13] "A company's history of expansion through mergers presents a different economic picture than a history of expansion through unilateral growth.  Internal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investments in plants, more jobs and greater output.

20.     Hawaiian offers flights to ten international destinations across seven countries in the Pacific and Asia, none of which are served by Alaska—these are additional markets that Alaska is seeking to buy into, rather than compete into.

21.     If the acquisition goes forward, competition may be lessened in each of the foregoing markets.

22.     If Alaska desires to enter, or expand its presence in, these markets, it should compete for such market share, not buy it.

23.     The "threatened loss or damage" to Plaintiffs and to the public at large by the potential elimination of Hawaiian as a competitor in the market is substantial and foreboding, and the proposed acquisition clearly violates the Clayton Antitrust Act:

      a.  Hawaiian is a significant rival of Alaska, as well as a significant rival of other domestic airlines including Network Carriers (also known as Legacy Carriers), Low Fair Premium Product Carriers ("**LFPC**"), and Low-Cost Carriers ("**LCC**").

      b.  The acquisition price of $1.9 Billion is not trivial, the acquisition follows a trend of consolidation in the industry, and the acquisition

---

Conversely, expansion through merger is more like to reduce available consumer choice while providing no increase in industry capacity, jobs or output.  It was for these reasons, among many others, Congress expressed its disapproval of successive acquisitions.  Section 7 [of the Clayton Antitrust Act] was enacted to prevent even small mergers that added to concentration of the industry." Brown Shoe Co. v. U.S., 370 U.S. 294, 345 fn. 72 (1962).

could (a) eliminate a significant rival of Alaska, and (b) allow Alaska to buy its way into new markets, rather than to enter into them competitively.

24.    The current trend toward concentration, the lessening of competition and the tendency to create a monopoly in the airlines industry is unmatched, unparalleled, and dangerous.

25.    Alaska's proposed acquisition of Hawaiian follows this dangerous trend, will substitute an absentee owner for the State's current largest private employer, may eliminate jobs, and may lead to higher fares, higher fees, new fees, reduction of routes, reduction of capacity, and a downgrading of flight amenities, amongst other dangers.

26.    The proposed acquisition is prohibited by the binding authority of the Supreme Court of the United States in its decisions in Brown Shoe Co. v. United States, 370 U.S. 294 (1962), United States v. Philadelphia Nat'l Bank, 374 U.S. 321 (1963), United States v. Aluminum Co. of America, 377 U.S. 271 (1964), United States v. Von's Grocery Co., 384 U.S. 270 (1966), United States v. Pabst Brewing Co., 384 U.S. 546 (1966), and United States v. Falstaff Brewing Corp., 410 U.S. 526 (1973).

## **PARTIES**

27.    Plaintiffs named below are individual citizens of cities and states listed. Each Plaintiff is an airline passenger, and some are former travel agents, all with the

express interest and intent in ensuring that the unique qualities of Hawaiian are preserved as a competitive option for them, now and in the future.  The potential elimination of Hawaiian may cause loss and harm to the Plaintiffs, and to the public at large, of the salutary benefits of the competition that Hawaiian brings, as well as the opportunity to fly and continue to fly on Hawaiian.

> Warran Yoshimoto (Honolulu, HI)
> Kristin Barroga (Honolulu, HI)
> Sean Kettley (Kailua, HI)
> Carolyn Fjord (Winters, CA)
> Don Freeland (Thousand Palms, CA)
> Don Fry (Colorado Springs, CO)
> Bill Rubinsohn (Jenkintown, PA)
> Clyde S. Stensrud (Kirkland, WA)

28.     Defendant Alaska Air Group, Inc. is the parent company of Defendant Alaska Airlines, Inc.  It is a corporation incorporated under the laws of the State of Delaware with its principal place of business in Seattle, Washington.

29.     Defendant Alaska Airlines, Inc. is an Alaska corporation with its principal place of business in Seattle, Washington.

## JURISDICTION AND VENUE

30.     This private action is specifically authorized by Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) which provides in pertinent part that "any person…shall be entitled to sue and have injunctive relief …against threatened loss or damage by a violation of the antitrust laws."  (Emphasis added).

31.    The remedy afforded to private plaintiffs includes divestiture or prohibiting any potential unlawful acquisition.  As was unequivocally stated by the United States Supreme Court in <u>California v. American Stores Co.</u>, 495 U.S. 271, 283 (1990), "[T]he literal text of Section 16 is plainly sufficient to authorize injunctive relief [in favor of a private Plaintiff], including an order of divestiture, that will prohibit that conduct from causing that harm."[14]

32.    The private action to vigorously challenge an acquisition is encouraged by the Congress and the Supreme Court of the United States.  In strong and unmistakable language, the Supreme Court has declared: "The Act's other provisions manifest a clear intent to encourage vigorous private litigation against anticompetitive mergers."  <u>American Stores Co.</u>, 495 U.S. at 284.

---

[14] This private action is specifically authorized by Section 16 of the Clayton Antitrust Act on the grounds that the proposed acquisition threatens  loss or damage to the Plaintiffs by reason of the potential lessening of competition in the airline market in violation of the antitrust laws.

Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, provides: "**Injunctive relief for private parties; exception; costs**: Any person, firm, corporation, or association shall be entitled to sue for … against <u>threatened</u> loss or damage by a violation of the antitrust laws, including section[] . . . 18 … this title, when and under the same conditions and principles as injunctive relief against <u>threatened</u> conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the <u>danger</u> of irreparable loss or damage is immediate, a preliminary injunction may issue . . . In any action under this section in which the Plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such Plaintiff."  (Emphasis added).

33.     Plaintiffs bring this action under the authority of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) and allege that the proposed elimination of Hawaiian by Defendant Alaska constitutes a substantial threat of injury to the Plaintiffs because the acquisition may have the effect substantially to lessen competition and tend to create a monopoly in various markets in violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. 14 § 18).

34.     This Court has subject matter jurisdiction over this action under Section 15 of the Clayton Antitrust Act, 14 U.S.C. 25, and 28 U.S.C. §§ 1331 and 1337(a).

35.     The proposed acquisition is in and substantially affects the interstate and foreign commerce of the United States in those flights, supplies, maintenance, parts and all the accoutrements and other necessities of the passenger airline industry are in the constant flow of the interstate and foreign commerce of the United States. Because Defendants transact business in this judicial district, venue is proper pursuant to 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. § 1391.

## FACTS

### The Trend of Mergers and Acquisitions in the Airline Industry

36.     The passenger airline industry is a critical and vital modern necessity to the commercial, social and political well-being of the United States.  Competition rather than combination is the rule of trade in the United States so that these Plaintiffs, and the public at large, may enjoy the benefits of competition, including, *inter alia*, the best possible services at the lowest possible prices.   Vigorous

enforcement of the antitrust laws by private persons is an essential part of the Congressional plan to ensure that competition rather than monopoly is, and remains, the rule of trade in the United States, including the airline industry.

37.     Four major airlines dominate the United States industry today, but this was not always the case.  Two decades ago, more than a dozen significant airlines competed domestically.  Several legacy carriers like American Airlines and United Airlines utilized "hub-and-spoke" systems to offer travelers access to numerous domestic and international destinations.  These airlines offered multiple classes of service and a broad range of amenities in order to cater to many different types of travelers.  The legacy carriers faced competition from "low-cost" carriers like Southwest, Airtran and JetBlue.  These low-cost carriers typically had a single class of service, fewer amenities, and a smaller network which enabled them to offer fares that were frequently lower than their competitors.  More recently, ultra-low-cost carriers ("**ULCC's**") emerged offering travelers even lower fares by lowering their cost structures, offering simplified onboard experiences, and removing some features typically included in ticket price.

38.     Consolidating has reshaped the industry, and in 2008, major airlines began their feeding frenzy of mega-acquisitions which has resulted in the reduction of the major airlines from eight competitors to four, effectively halving the principal competitive air transportation choices to the passenger public.

39.    The vital and critical importance of the longstanding and unique offering of Hawaiian and its presence in the airline markets can be measured against the near total lack of competition among the other major airlines and the abuses that have flowed and continue to flow as a result of their calculated scheme, which threatens to inundate the entire industry like an enveloping tsunami. Hawaiian is an important bulwark to stop this almost unstoppable trend toward complete concentration and monopoly in the airline industry.

40.    In 2008, Delta Airlines swallowed its significant actual and potential rival, Northwest Airlines, to form the largest airline in the United States at the time. Less than two years later, in 2010, United Airlines devoured its significant actual and potential rival, Continental Airlines, to become the then-largest airline in the United States. In 2011, Southwest Airlines consumed its significant actual and potential Low-Cost Carrier rival, AirTran, to become the carrier with the largest number of passengers in the United States and the largest Low-Cost Carrier. In 2013, American Airlines ingested its significant actual and potential competitor, USAir, becoming the largest airline in the United States. In 2016-17, Alaska consumed Virgin America. And in 2023-2024, JetBlue attempted to acquire Spirit Airlines, an acquisition that was enjoined in 2024, after suits by private parties and the Department of Justice (DOJ).

41.    Since these airline mega-acquisitions began, capacity has been substantially reduced and airfares increased notwithstanding a strengthening

economy and increased demand for air travel.  According to a 2013 study, since 2007, scheduled domestic capacity in the 29 largest hubs has been reduced by 9%; in the 35 medium hubs, scheduled domestic capacity has been reduced by 26%; and in the 70 small hubs, scheduled domestic capacity has been reduced by 18%.  The remaining flights have become more crowded.

42.     Since the mega-acquisitions began, the major airlines have increased and continue to increase their ancillary fees.  In 2012, Delta, United, American and USAir charged more than $1 billion in reservation change fees.  In 2012, U.S. domestic airlines collected more than $3.5 billion in baggage fees.  In 2013, the four major carriers Delta, United, American and USAir all raised their charge for accommodating ticket changes from $150 to $200.

43.     Indeed, JetBlue warned in 2019 that "[a]ll power in the hands of a very few deep-pocketed airlines has implications for consumers in the form reduced options, high fares, and often poor service."  These implications also include an increased risk of coordination in the oligopolistic airline industry.  JetBlue and Alaska then attempted to join the legacy airlines.  JetBlue was enjoined.  Alaska, in this case, must be enjoined.

44.     If the proposed acquisition of Hawaiian Airlines is consummated, these fees, particularly in Hawaiʻi, may likely increase.  Alaska admits that the consolidation in the industry has "fundamentally changed the industry structure" and

that the airlines have found several "new revenue sources," earning a whopping $45 billion from 2010 to 2015.

45.     The four behemoths, Delta, United, Southwest and American, after having substantially eliminated all significant major competition, now control 84% of all passenger airline service in the United States.  To maintain this dominance and control of the industry, these four giants stay in constant contact and instant price communication by means, among others, of a jointly owned and controlled "clearing house", APTCO, as well as CEO and executive contacts through secretive email, private telephone calls, and personal meetings at resorts, association meetings, private offices, restaurants, the secretive "Conquistadores del Cielo" annual shindig, and elsewhere, to stabilize fares, encourage "capacity discipline," shutdown flights, and commit other anticompetitive practices and conduct.

46.     This breakdown in the free enterprise system in this important and critical American industry has resulted in the most unfriendly of skies for passenger airline service and pricing in the history of the industry since "deregulation" occurred in 1978.  Fares have substantially increased regardless of plunging costs and higher demand.  Airplane capacity growth has been stifled by agreement.  Thousands of employees (including executives, middle management, administrators, planners, pilots, flight attendants, maintenance workers, etc.) have been laid off because of the substantial elimination of meaningful competition.  Absentee owners who have little if any care for local communities and markets have prevailed.  Available flights have

been sharply reduced.  New, illogical and unreasonable fees - many of which have been purposefully hidden from the public - have been initiated in concert and by agreement among those competitors.  Airports have been abandoned.  Markets have been divided.  Additional seats have been added to aircraft to cram passengers into sardine-tin airplanes.  Round-trip, "open jaw," and end-to-end passengers (mostly small, medium and even large business travelers flying to multiple city destinations) have been forced to pay higher fares than the simple addition of their flight segments for the same flight, same seat, and same time in order to subsidize the Big Four's below cost and predatory pricing on certain segments specifically aimed at fledging Ultra Low Cost Carriers ["**ULCC**"] such as Spirit, Allegiant and Frontier and Low Cost Carriers ["**LCC**"] such as Sun Country.

47.    By reason of this "closed" market, the Big Four are able to (1) engage in extraordinary anticompetitive and monopolistic practices and conduct without fear of competitive retribution by new entrants; (2) impose a cavalcade of abusive and discriminatory charges and fees against a helpless public, and (3) repudiate the laws of supply and demand.  For example, when the price of oil dropped more than 50% from $103 to $47 per barrel – fuel being 40% of the cost to run an airline - the leader of the Big Four, Douglas Parker, CEO of American Airlines, announced that fares were going to continue at the higher rates just as though the price of oil had remained at $100 or more!  Or, after all of the Big Four had eliminated their significant actual and potential rivals, the CEOs continued to meet at their annual

conclave, designated by them as the "Conquistadores del Cielo" (Conquerors of the Sky) - a closed group who adopted a covenant of secrecy about anything discussed at their dude ranch gatherings.  At these outings, previously held in Arizona and now currently held at the A-Bar-A Ranch in Jackson, Wyoming, and subsequently at an IATA meeting, they agreed to observe "capacity discipline" in order to stabilize and raise fares and increase profits.

48.    And in a calculated insult to business travelers, American, Delta, and United further agreed through their wholly owned IATA "clearing house" to significantly raise the fares booked as multi-city flights even though the combined fares for individual segments on the same trip were much lower.  American, Delta and United have threatened both travel agents and passengers:  the travel agents were required to pay the difference between the multi-city fare and the individual fares, or fear losing their licenses; the passengers were threatened with the possibility of lost baggage and missed flights due to baggage delays or flight cancellations.

49.    In sum, the Big Four, acting in unison, have transformed the historical joy, adventure, and pleasure of air travel into drudgery, or, sometimes, even punishment and hidden thievery.  To counter the plethora of complaints levelled against the Big Four, American Airlines launched a multi-million dollar "Great Flyer" advertising campaign implying that the plight of the passengers is really their own fault in failing to accept inconvenience, abuse, exorbitant expense and discomfort as the price for the privilege to fly.

50.     The Big Four airlines (American, United, Delta and Southwest), account for 74/84% of US capacity.[15]  Alaska is the fifth largest.[16]

51.     Departing Seats (One Way), for the busiest US airlines in June 2023 showed[17]:

| Carrier Name | Seats |
|---|---|
| American Airlines | 20,055,506 |
| Southwest Airlines | 19,148,642 |
| Delta Airlines | 18,357,826 |
| United Airlines | 15,364,457 |
| Alaska Airlines | 4,653,246 |
| Spirit Airlines | 4,063,415 |
| JetBlue Airways Corporation | 3,667,066 |
| Frontier Airways Corporation | 2,829,332 |
| Allegiant Air LLC | 1,969,386 |
| Hawaiian Airlines | 1,125,462 |

---

[15] https://www.oag.com/blog/biggest-airlines-in-the-us#:~:text=The%20%22big%20four%22%20US%20airlines,under%2073%20million%20between%20them.
[16] https://aviationweek.com/air-transport/airports-networks/network-analysis-alaska-hawaiian-union;.  Alaska is the fifth largest airline in the domestic market as of December 2023.
[17] Data Obtained from https://www.oag.com/blog/biggest-airlines-in-the-us#:~:text=The%20%22big%20four%22%20US%20airlines,under%2073%20million%20between%20them.

52.    The current breakdown of carrier types is:

| Network Carriers/Legacy Carriers | United<br>Delta<br>American |
|---|---|
| Low Fair Premium Product Carriers ("**LFPC**") | Alaska<br>Hawaiian<br>Jet Blue |
| Low-Cost Carriers ("**LCC**") | Southwest<br>Sun Country |
| Ultra Low-Cost Carriers ("**ULCC**") | Spirit<br>Allegiant<br>Frontier |

**Hawai'i-US Mainland Market**

53.    Six major airlines comprise most direct flights to and from the US mainland and Hawai'i: Hawaiian, Alaska, American, Delta, Southwest, and United.

54.    As of December 2023, the Hawai'i-U.S. mainland seat capacity by airline was:



**Hawaiian Airlines**

55.     Hawaiian is Hawai'i's biggest and longest serving airline, having servicing Hawai'i for 95 years.  Hawaiian employs over 7,200[18] workers and is a key factor in tourism in the State.  In 2022, Hawaiian spent $1.6 Billion in Hawai'i.  Hawaiian supports approximately $10 Billion in economic activity.

56.     Hawaiian offers more services to its customers than any other domestic airline, including Island-inspired meals for every palate, in-flight entertainment, a pau hana cart with island-style snacks, pillows/blankets and last-minute gift items, Hana Hou - the award-winning inflight magazine, featured in-flight partners and music of Hawai'i from the moment you step on board.  Hawaiian has long lasting ties to the local community and culture.  It supports local businesses, has an extensive flight schedule, and very loyal customer base.  When Southwest Airlines began interisland flights, studies showed that even if Hawaiian flights were more expensive than Southwest to the same destination, customers would still choose Hawaiian.   In 2023, Hawaiian outperformed Southwest by 23% for airplane occupancy, even with average higher prices.

---

[18] See https://www.hawaiianairlines.com/careers/working-with-us#:~:text=Our%207%2C000%2B%20employees%20are%20honored,the%20rest%20of%20the%20world.

57.     Hawaiian is committed to social responsibility and to help malama aina. This commitment includes aircraft that are 20% more environmentally friendly. Hawaiian's fleet includes wide body planes, and flat-bed seats in business class.

58.     Hawaiian has a vast loyalty program and offers amazing benefits to its members such as free or discounted checked baggage, earning miles on how far you fly, miles that will never expire, miles redeemable for any seat in Main Cabin, no blackout dates, miles on every purchase, an annual companion discount, and 60,000 bonus miles just for signing up for the Hawaiian credit card.

59.     Hawaiian has the most on time carriage for the last 3 years.

60.     A 2019 90th Anniversary Economic Impact Report of Hawaiian Airlines (the "**2019 Impact Report**"), reported that according to Department of Transportation (DOT) figures, Hawaiian carried more passengers who were starting or ending their trip in Hawaiʻi than any other airline.[19]

61.     In 2018, Hawaiian supported 284 non-profit organizations through cash donations, in-kind donations to 501(c)3s, and the Hawaiian Airlines Foundation. Between 2013 and 2018, Hawaiian donated more than $2 million to local charities and non-profits.

62.     Hawaiian provides a service to Hawaiʻi which is unmatched anywhere else in the U.S. and most of the world.  The regional economy could be severely

---

[19] https://www.responsibilityreports.com/HostedData/ResponsibilityReportArchive/h/NASDAQ_HA_2018.pdf.

stalled and irreparably harmed without the airline's inter-island, domestic, and international flight services.

63.    The 2019 Impact Report showed that in 2018, Hawaiian generated the equivalent of $9.3 billion for the local economy, supporting 60,600 total jobs, and transporting 2.7 million passengers to the State.

64.    The 2019 Impact Report further addressed that because Hawaiian is based in the State, and because every one of its flights starts or ends its journey in Hawaiʻi, most of its pilots, cabin crews, mechanics, and administrative staff are based locally.

65.    In 2018, Hawaiian was the number one global provider of seats to and from Hawaiʻi, according to the 2019 Impact Report, amounting to about 11.8 million total passengers who fly to, from and between the Islands, and continued to spend money throughout the State on commodities such as food, beverage, retail, car parking and rental expenditures.

66.    The 2019 Impact Report also discussed the huge role Hawaiian has to play in cargo transports.  Businesses in Hawaiʻi rely on imports to fulfill nearly half of industry demands and many rely on daily shipments of high value and perishable goods both from neighbor islands and the US Mainland.  The State's economy greatly benefits from Hawaiian's ability to provide a critical component of infrastructure to meet the demands of industries such as healthcare, food and

beverage, retail, and veterinary services.  Only freight carriers such as UPS and FedEx carry more cargo to Hawaiʻi than Hawaiian.

67.     Because of Hawaiian, Hawaiʻi businesses are also able to reach markets all over the globe.  Goods exported from the State support over 3,200 jobs and the direct income from major export industries continues to grow, increasing 25% from 1990 to 2016.  As of 2019, each week Hawaiian exported 500 tons or so of goods from and across the Islands to the U.S. mainland alone, adding $129.7 million to Hawaiʻi's economy.

68.     By the numbers, 2018 therefore showed Hawaiian generated $3.22 billion in visitor spending in State, 1.9 million visitors to Hawaiʻi, 500 tons of cargo to the U.S. mainland each week, 765 tons of cargo from the U.S. mainland each week, Hawaiian spent $1.2 billion on operational expenditures in the State, and spent $106 million on capital expenditures.

69.     While Hawaiʻi's tourism took a huge hit with the COVID-19 pandemic, which was evidenced by a more than 90% decrease in Transient Accommodation Tax, Hawaiian avoided large numbers of layoffs and acted as a buffer against major economic shock.

70.     The number of visitors to Hawaiʻi was significantly impacted by COVID-19 and the related restrictions imposed on travel.  Statewide, Hawaiʻi has not recovered its international tourist volumes to pre-pandemic rates, with foreign visitor markets such as Japan, Canada, and others in the Asia-Pacific region

continuing to impose mandatory quarantine periods and sentiment toward international travels.  For example, Japan placed caps on international arrivals. Additionally, macroeconomic factors impacted foreign exchange rates, inflation in the United States and airline fuel surcharges, which contributed to a slow return to pre-pandemic travel.

71.    Nonetheless, Hawaiian remained a driving force in the State's economy.

72.    Post pandemic, Hawaiian Airlines 2022 Economic Impact Report ("**2022 Impact Report**")[20] concluded Hawaiian directly contributed 7,158 jobs to the State of Hawai'i, and Hawaiian's activity annually supported the employment of an additional 46,342 people throughout Hawai'i, for a total of 53,500 jobs statewide. This equated to approximately 9% of Hawai'i's total jobs.

73.    Hawaiian additionally supported more than $10.1 billion of industry activity, which made up 11% of Hawai'i's total GDP.  This translated to $607.5 million of realized tax revenue to the state, or 6% of total tax revenue to the State.

74.    The 2022 Impact Report showed Hawaiian had $2.4 billion in operating revenue and was named as #1 in Hawai'i by Forbes in America Best Employers.

---

[20] https://issuu.com/hoike/docs/ha-economic-impact-report-02-23.

75.   The 2022 Impact Report showed Hawaiian carried 9.4 million passengers total, of which 4.7 million were interisland; exported 630 tons of cargo weekly and imported 820 tons of cargo weekly.

76.   An assessment of both the economic and cultural impacts of Hawaiian's activities in the State of Hawai'i shows a picture of a company that is not only a driver of the State's economy and unique culture, but a key linchpin that significantly affects the daily lives of our citizens and the countless business and organizations that rely on services.

77.   And the future for Hawaiian has even more to offer.  Hawaiian has recently begun cargo service for Amazon.  Hawaiian is in the process of receiving or expecting delivery of a fleet of Boeing 787s with more premium seats.  Hawaiian ordered 12, took 1, and will be taking 3 more this year.

78.   Hawaiian operates 170 interisland flights per day, including flights to and from Honolulu to Lihue, Kahului, Kailua-Kona, and Hilo.  Hawaiian also runs interisland flights between Kahului and Hilo, Kailua-Kona, Lihue; and to and from

Kailua-Kona and Lihue.



21

79.     Hawaiian has twenty-eight routes (28) (to fifteen (15) destination cities) in its network linking Hawaiʻi with the Mainland.  Hawaiian offers numerous direct flights to and from the mainland, including connections with Austin, Boston, Las Vegas, Long Beach, Los Angeles, New York City, Oakland, Ontario, Phoenix, Portland, Sacramento, San Diego, San Francisco, San Jose and Seattle.  Hawaiian also offers connecting flights with partners around the Continental United States.

---

21 Map obtained from https://www.hawaiianairlines.com/destinations.

80.     Hawaiian also serves as an anchor gateway airline from Hawaiʻi to Asia and the Pacific, with direct flights to and from American Samoa, Australia, the Cook Islands, French Polynesia, Japan, New Zealand, South Korea, as well as connecting partner flights around the Pacific and Asia.



22

### **Alaska's Trend of Consolidation through Acquisitions**

81.     Alaska, headquartered out of Seattle, Washington, is the fifth largest airline in the United States.  Alaska and its regional partner serve more than 120

---

[22] https://www.hawaiianairlines.com/destinations.

destinations across the United States, the Bahamas, Belize, Canada, Costa Rica, Guatemala and Mexico.

82.    With Alaska's acquisition of Virgin America ("**Virgin**") in 2017 for $2.6 Billion, it cemented its presence on the West Coast of the United States, and *erased* all vestiges of the Virgin America brand and retired its former planes.

83.    In 2007, when the trend toward concentration and the elimination of competition was beginning to heat-up in the airline industry, Virgin, with much fanfare, initiated service from San Francisco International Airport.  Virgin offered a new promise of adventure, fun and excitement, as well as important destinations, convenient flight availabilities, new aircraft, expansion to major cities and lower cost of travel.

84.    Since 2007, while the Big Four were shrinking their services, initiating hidden charges, cutting back their flights and inflating their fares, newborn Virgin was expanding and burgeoning.  By 2015, Virgin achieved annual revenues of $1.5 billion and pre-tax profits of $200 million – by the end of March 2016, Virgin posted net income of $345 million.  Just four days later, Alaska announced that it had bought Virgin.

85.    More than seven million annual passengers flew on Virgin to twenty-four destinations.  Virgin flew to all ten of the top ten markets from San Francisco and to all ten of the top ten markets served out of Los Angeles.  Its fleet of aircraft climbed to 63 Airbus planes with 45 new Airbus aircraft on order.  Destinations and capacity expanded to 24 prime locations stretching from Hawai'i to San Francisco and Los

Angeles, and from the West Coast to Boston, New York and Washington DC, with flights to Mexico as well. Hubs were established in San Francisco, Los Angeles and Dallas. In addition to these extraordinary successes and growth through increased capacity, Virgin was particularly well-positioned for the anticipated future demand for air travel for business and pleasure which is concededly "bullish" for premium low fare carriers and the rest of the airline industry. Virgin was on the rise.

86. With such astonishing successes and an ever-increasing and loyal passenger base, Virgin was eyed as a very substantial and dangerous competitive threat to the status quo, and especially to its significant West Coast rival, Alaska, the defendant in this case.

87. In 2017, Alaska expanded exponentially, and eliminated its substantial competitor, by acquiring Virgin. Alaska thereby gained dominance over the entire West Coast of the United States. When Alaska acquired Virgin, Alaska essentially bought the West Coast.

88. Alaska now dominates the West Coast corridor and serves the same cities as Hawaiian on numerous overlapping direct flights.

89. Alaska began flying to Hawaiʻi in 2007. Now Alaska is trying to buy the largest traffic to and from Hawaiʻi, and to buy key markets in Asia and the Pacific via Hawaiʻi, in a clear effort to expand its monopolistic dominance over the markets that Hawaiian serves.

## Alaska's Acquisition of Hawaiian Could Hurt Travelers

90.     Alaska and Hawaiian are both somewhat traditional airlines.  Their fares are typically in line with larger carriers, and higher than those charged by discount airlines.  In September of 2023, both charged slightly lower than average fares for economy class seats between Hawai'i and the mainland, according to figures from aviation data firm Cirium.

91.     Hawaiian often tops the industry for on-time flights, and Alaska usually also ranks near the top.  Both score in the middle for consumer complaint rates, according to U.S. Department of Transportation data.

92.     Of the twenty-eight (28) routes in Hawaiian's network with the mainland, Alaska serves 12 of these routes, equating to an overlap of 43% of Hawaiian's Hawai'i-mainland market, and 25.5% of Hawaiian's overall network.

93.     Alaska's Hawai'i-mainland network spans 24 routes – therefore Hawaiian serves half of them currently.

94.     Of Alaska's 24 routes between the U.S. mainland and Hawai'i, 8 are to Honolulu, 7 are to Kahului, 5 are to Kona, and 4 are to Lihue.

95.     Of the 12 overlapping routes, six originate from Honolulu, and six originate from Kahului Airport (OGG) on Maui. From the two airports, both Alaska

and Hawaiian serve Los Angeles, Portland, San Diego, San Francisco, San Jose, and Seattle, as shown below.[23]





96.    As this chart[24] demonstrates, the acquisition of Hawaiian would result in some monopoly markets (Seattle/Honolulu) and some oligopoly markets (Los Angeles/Honolulu; Seattle/Kahului; Portland/Honolulu; San Diego/Honolulu).

97.    Hawaiian and Alaska are the second and third largest providers of Hawaiʻi-U.S. mainland capacity at present, behind United, which has a 23.5% capacity share.  Hawaiian has 23.2% and Alaska has 16.9%.  If Alaska's acquisition is allowed, Alaska would have over 40% capacity share for Hawaiʻi-U.S. mainland

_____

[24] Chart obtained from https://airserviceone.com/alaska-airlines-hawaiian-would-have-40-of-hawaii-mainland-us-capacity-but-compete-on-just-12-routes/.

routes (and about 48% to West Coast states[25]) and become the largest airline in Hawai'i.

98.    Travelers to and from Hawai'i benefit from Hawaiian's competition against Alaska, particularly on the 12 distinct direct overlapping routes.  Alaska's acquisition of Hawaiian could hurt these travelers in numerous ways.  It could eliminate vigorous head-to-head competition between Hawaiian and Alaska that travelers rely on every day.  The airline industry as a whole could lose a major competitor offering distinct services, and see Alaska become the dominant seat capacity from and between Hawai'i and the U.S. mainland.

99.    Alaska's elimination of Hawaiian as competition increases the risk that it could reduce flights on the 12 overlapping routes, raise fares and other fees and/or reduce capacity.  Additionally, Alaska, already the fifth largest carrier in the country, in acquiring Hawaiian, increases the risk that the remaining airlines could cooperate to raise fares on particular routes to and from Hawai'i.

100.   The acquisition may reduce various aspects of consumer choice, including where both Alaska and Hawaiian compete in service, on-time performance, and cancellation rates.

101.   The acquisition may cause fares to rise not only within Hawai'i and between Hawai'i and the U.S. Mainland, but also throughout the Pacific and Asia,

---

[25]    https://airserviceone.com/alaska-airlines-hawaiian-would-have-40-of-hawaii-mainland-us-capacity-but-compete-on-just-12-routes/.

from Australia to Japan, because Hawaiian's route map will give Alaska a commanding presence in the region post-acquisition.

102.   Further the acquisition may not just decrease Alaska's competition in the region – its partners could also benefit from shrinking competition in the Pacific and Asia, allowing them more leeway to charge higher fares.[26]

103.   Under controlling U.S. Supreme Court precedent interpreting the Clayton Antitrust Act, Alaska's acquisition is presumed to have anti-competitive effects on the market between the U.S. and the mainland, because it could significantly increase concentration and result in highly concentrated markets on those routes.  See United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 363-64 (1963).

104.   A combined network of Hawaiian and Alaksa would look like this:

---

[26]      https://www.cntraveler.com/story/alaska-hawaii-airlines-merger-impact-on-travelers



27

**Alaska's Proposed Acquisition of Hawaiian Heightens the Risk that Remaining Airlines Could Coordinate to Raise Fares**

105.   Companies are incentivized to maximize profits.  Competitive markets force companies to reduce price or improve products to offer customers better deals than their rivals.   Sometimes markets do not work this way: instead of fierce competition, companies accommodate their mutual desire for higher profits and thus engage in activities designed to soften competition with each other.   Antitrust law refers to this as coordination or coordinated behavior, and it may come through

---

27   Alaska Air Group Investor Presentation, December 3, 2023, available at https://investor.alaskaair.com/static-files/b576ec5f-3b6c-4ae5-8b52-9606195cbd43.

formal agreements, implied understandings, or parallel accommodating conduct. Regardless of how it is accomplished, coordinated behavior comes at a price to consumers who face higher prices and or reduced output. The Clayton Antitrust Act prohibits mergers and acquisitions that increase the risk of coordinated effects and substantially lessen competition.

106.    The airline industry is already very vulnerable to coordination, and the ever-shrinking consolidated number of airlines only increases the likelihood of coordinated behavior. Airlines publicly file their fares through ATPCO, which provides all airlines with detailed real-time access to published fares. Airlines have a history of using ATPCO to engage in coordinated behavior, conduct which became the subject of a Department of Justice action and court-ordered injunction in 1992.

107.    Additionally, airlines utilize data-scraping tools to track prices and schedules that their competitors offer on individual websites. Because on most routes there are only a small number of significant competitors, it is easy for airlines to send each other signals. Many airlines overlap on multiple routes, providing opportunities to use fare increases or discounts on one route to influence or discipline a rival's behaviors on another – all in coordinated pursuit of higher fares. Airlines have a strong incentive to protect high prices on routes to and from certain airports where they have high shares of traffic.

108.    These factors make it easier for airlines to play "follow the leader" in the industry, particularly with respect to fair increases. If one airline increases a

price, other airlines can immediately see the increase and consider following with their own increase.  The initiating airline will then check to see if the other airlines matched the increase.  If so, the initiating airline is likely to maintain its price increase.  If not, the initiating airline may withdraw the increase shortly thereafter.

### Relevant Geographic Markets

109.   The Clayton Antitrust Act bars acquisitions where "any activity affecting commerce in any section of the country" where the effect of such acquisition "may be to substantially to lessen competition, or to tend to create a monopoly."  Clayton Antitrust Act (15 U.S.C. § 18).

110.   Courts define relevant product and geographic markets to determine which lines of commerce and which areas of the country may be harmed by an acquisition.  Here, scheduled air passenger service is a relevant product market and there are three relevant large geographic markets.

111.   Airfares are generally constrained by actual and potential competition from other airlines within the market.  Since any major existing airline has the capability to enter any market throughout the United States, the threat of potential competition from other existing airlines entering the market constrains airfares and services.

112.   The proposed acquisition of Hawaiian by Alaska may greatly reduce airline competition in three distinct markets:

a.  Hawaiʻi – US mainland

43

b.  Interisland in Hawaiʻi

c.  Hawaiʻi to Pacific and Asia

113.   The proposed acquisition of Hawaiian by Alaska may give Alaska a 40% capacity of the Hawaiʻi – US mainland market, more than any other airline. Hawaiian and Alaska already dominate the Hawaiʻi-West coast corridor, with 12 overlapping flights.   There is little doubt that, post-acquisition, airfares will rise between the Hawaiʻi and the US mainland generally, and specifically between Hawaiʻi and the West Coast.

114.   The proposed acquisition may give Alaska Hawaiian's 67% achieved market in interisland flights.   Executives of Hawaiian and Alaska have described controlling the Hawaiian interisland market as a large part of the deal's attraction. This would add Hawaiian's market share in the state, already bigger than any other airline, to Alaska.   While Hawaiian competes with Southwest for interisland fares, Hawaiian's load factor, a measure of occupancy, was 22 percentage points higher than Southwests, and passenger revenue per available seat mile, was 29.3 cents for Hawaiian versus 10.6 cents for Southwest, as reported in 2023.[28]   Even though Southwest dropped its interisland fares to compete with Hawaiian, people continued to choose Hawaiian.   Concerns about interstate dominance will only be enhanced if

---

[28]        https://www.civilbeat.org/2023/03/hawaiian-vs-southwest-good-news-for-travelers-bad-news-for-the-bottom-line/

there is an acquisition by a larger carrier with more resources and capital to fight off competition with Southwest.

115.   The acquisition of Hawaiian may also create far reaching negative effects throughout Asia and the Pacific.  Alaska is a member of "Oneworld" which along with SkyTeam and Star are the three global "mega-alliances" granted anti-trust immunity to permit cross-border marketing and codesharing agreements.  A 2011 Department of Justice study found these three groups reduce competition and raise fares.  Oneworld's 15 members include American, Cathay Pacific, Japan Airlines, Malaysia and Qantas.  The acquisition of Hawaiian can be expected to impact travelers from Australia to Japan and beyond, as Alaska, American and their Oneworld partners could gain a significant toehold in the critical Hawai'i based market.

## Anticompetitive Effects of the Transaction

### Hawaiian Will be Eliminated as a Competitor in the Airline Industry

116.   The proposed acquisition will allow Alaska, the country's fifth largest airline, to swallow the country's tenth largest airline.

117.   The proposed acquisition will presumably give Alaska 40% of the Hawai'i US-mainland market and over 60% of the interisland market, and will allow Alaska to buy its way into Asia and the Pacific along with its mega-alliance, rather than enter through competition, in contravention of the U.S. Supreme Court's

decisions in <u>Brown Shoe Co. v. U.S</u>., 370 U.S. 294 (1962) and <u>U.S. v. Falstaff, 410 U.S. 526</u> (1973).[29]

118.   As set forth by <u>Brown Shoe Co</u>., it is the policy of the United States making competition rather than merger and acquisition, as the rule of trade.[30]

119.   The proposed acquisition will eliminate Hawaiian as a competing LFPC, leaving only Alaska and JetBlue, who as discussed above, was recently enjoined from trying to swallow ULCC Spirit.

120.   Post-acquisition air fares may increase, and there may be less routes as those currently covered by both Hawaiian and Alaska are consolidated.

121.   The proposed acquisition will eliminate the only airline headquartered in Hawai'i, leaving Hawaiian controlled by an absentee owner in Seattle.   While Alaska claims many of the 7200 jobs of Hawaiian airline employees will be protected, much is unclear at this time.

---

[29] Discussing how company who was not a competitor in a geographic market, nor would its merger with smaller company in market give it a dominant market force, was still a potential competitor to enter the market, and thus the proposed acquisition posed a threat to competition.

[30] "A company's history of expansion through mergers presents a different economic picture than a history of expansion through unilateral growth.  Internal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investments in plants, more jobs and greater output. Conversely, expansion through merger is more like to reduce available consumer choice while providing no increase in industry capacity, jobs or output.  It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions.  Section 7 was enacted to prevent even small mergers that added to concentration in an industry."  <u>Brown Shoe Co</u>., 370 U.S. at 345, fn. 72.

122.   Hawaiian currently contributes upwards of $10.2 billion in Hawai'i's economy annually, with a tax impact of over §607.5 million.  Hawaiian controlled by Alaska may not.

123.   And while Alaska promises now to maintain the Hawaiian brand and commitment to the community, Alaska's acquisition of Virgin American tells a different story, where nothing of Virgin America remains.

<u>The Relevant Markets are Highly Concentrated and the Proposed Acquisition of Hawaiian May Result in Presumptively Unlawful Market Concentrations</u>

124.   The decrease in the number of major airlines over the last decade reflects a persistent and deliberate pattern of concentration and reduction of competition in the U.S. airline industry, a trend which the Supreme Court has said must be arrested at its incipiency.

125.   The acquisition of Hawaiian by Alaska will result in the fifth largest airline in the United States, currently with 16.92% of capacity of flights between Hawai'i and the U.S. mainland, acquiring the tenth largest airline and increasing that capacity to 40%.

126.   Market concentration is an indication of the level of competition in a market.  The more concentrated a market, and the more a transaction may increase concentration in a particular market, the more likely it is that a transaction may result in a meaningful lessening in competition.

127.   Hawaiian and Alaska have overlapping non-stop flights on 12 routes. The elimination of Hawaiian as a competitor may result in fare increases, fewer flights and availability, and the elimination of consumer choice, and, in all events may create a substantial increase in concentration.

128.   Alaska's acquisition of Hawaiian may cause substantial "lessening of competition" and thereby irreparable injury to Plaintiffs and to all consumers for Hawai'i-US mainland routes, as well those who fly interisland and between Hawai'i and Asia and the Pacific.  Consumer choice may be gone, and the danger and threat of harm may be irreparable.

129.   Further, Plaintiffs and all consumers are threatened with (1) the loss of the distinct services and in-flight experiences offered by Hawaiian; (2) a reduction of customer choice; (3) a reduction in capacity and the curtailment of flights thereby creating higher prices and severe inconvenience to consumers; (4) the loss of the only local airline currently headquartered in Hawai'i with the substitution of an absentee owner and operator; and (5) ultimately the loss of a vibrant, respected local competitor who has brought so much to Hawai'i since its inception.

130.   If Hawaiian is acquired, Plaintiffs may sustain irreparable harm for which damages may be inadequate to compensate Plaintiffs in that a direct rival may be extirpated and customer choice for travel options eradicated.

131.   Moreover, there may likely be no startup entrants into the airline market because new entrants could face significant barriers to entry, including difficulty in

obtaining access to gate facilities; difficulty in competing with the effects of corporate discount programs offered by dominant incumbents; difficulty due to customer loyalty to existing frequent flyer programs; difficulty of promoting an unknown brand; and the risk of aggressive responses to new entry by the dominant incumbent carriers. The former CEO of United testified that only an established airline could now enter the major markets in the United States. Indeed, American's CEO Doug Parker further admitted that no new airline could enter the market because it could not even be able to cover its cost of capital.

132.   Since the prospect of a new start-up entry is unlikely, the entry of new competitors in the marketplace cannot serve as a basis to mitigate the anticompetitive effects that may result from Alaska's proposed acquisition.

133.   Alaska as an existing airline, however, has the wherewithal, experience, financial ability, intent, size and expertise to enter into the very markets and areas it seeks to gain by its acquisition of Hawaiian. Such an entry by Alaska on new routes and into new markets would increase competition, create new jobs, lower fares, increase capacity, increase availability, and enhance consumer choice. The acquisition of Hawaiian could do the exact opposite.

134.   Accordingly, Plaintiffs bring this action for both preliminary and permanent injunctive relief against Defendants' proposed acquisition of Hawaiian and seek an order prohibiting Alaska from acquiring Hawaiian.

## VIOLATIONS ALLEGED

### Clayton Antitrust Act, Section 7 15 U.S.C. § 18

135.   The effect of the proposed acquisition may be substantially to lessen competition, or tend to create a monopoly, in interstate trade in commerce in the relevant markets in violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.

136.   Unless enjoined, the proposed acquisition may, and most probably could, have the following potential effects in the relevant markets, among others:

     d.   Actual and potential competition between Alaska and Hawaiian may be eliminated;

     e.   Competition in general among other airlines may be lessened substantially;

     f.   Ticket fares and ancillary fares may be higher than they otherwise could be;

     g.   Industry capacity may be lower than it otherwise could be;

     h.   Consumer choice may be lessened;

     i.   Service may be lessened;

     j.   The proposed acquisition may facilitate increased coordination among Alaska and its remaining competitors; and

k. Job layoffs, huge economic impacts on the State of Hawaiʻi, less frequent flights interisland, from Hawaiʻi to the mainland, and from Hawaiʻi to Asia and Pacific.

137.   By reason of this violation, Plaintiffs are threatened with loss or damage in the form of potentially higher ticket prices and diminished service, the potential elimination of a favored airline, as well as additional irreparable harm for which damages will be inadequate to compensate Plaintiffs.  Plaintiffs are entitled to bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief against the proposed acquisition, and to recover their costs of suit including reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief from this Honorable Court:

A.   Declaring, finding, adjudging and decreeing that the agreement of Alaska to acquire Hawaiian violates Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18;

B.   Preliminarily enjoining Alaska from consummating the acquisition of Hawaiian, or, if necessary, ordering divestiture, during the pendency of this action;

C.   Permanently enjoining Alaska and Hawaiian from consummating the acquisition or requiring divestiture;

D.    Declaring the contract between Hawaiian and Alaska to be null and void and against public policy of the United States which declares that competition rather than combination is the rule of trade in the United States;

E.    Awarding Plaintiffs their cost of suit, including reasonable attorneys' fees, as provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26;

F.    Granting Plaintiffs such other and further relief to which they may be entitled and which the Court finds just and proper.

DATED:    Honolulu, Hawaiʻi, April 15, 2024.

*/s/ Kukui Claydon*
STARN O'TOOLE MARCUS & FISHER
Terence J. O'Toole
Andrew J. Lautenbach
Kukui Claydon

ALIOTO LAW FIRM
(*Pro Hac Vice* Applications forthcoming)
Joseph M. Alioto
Tatiana V. Wallace

Attorneys for Plaintiffs
WARREN YOSHIMOTO; KRISTIN BARROGA; SEAN KETTLEY; CAROLYN FJORD; DON FREELAND; DON FRY; BILL RUBINSOHN; CLYDE D. STENSRUD