**O'MELVENY & MYERS LLP**
COURTNEY B. DYER (*pro hac vice*)
cdyer@omm.com
BRIAN P. QUINN (*pro hac vice*)
bquinn@omm.com
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300

STEPHEN J. McINTYRE (*pro hac vice*)
smcintyre@omm.com
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000

ANNA T. PLETCHER (*pro hac vice*)
apletcher@omm.com
Two Embarcadero Center
San Francisco, California 94111
Telephone: (415) 984-8700

PETER C. HERRICK (*pro hac vice*)
pherrick@omm.com
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000

**BRONSTER FUJICHAKU ROBBINS**
**A Law Corporation**
MARGERY S. BRONSTER (4750)
mbronster@bfrhawaii.com
REX Y. FUJICHAKU (7198)
rfujichaku@bfrhawaii.com
1003 Bishop Street, Suite 2300
Honolulu, Hawai'i 96813
Telephone: (808) 524-5644

*Attorneys for Defendants Alaska Airlines, Inc.*
*and Alaska Air Group, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAIʻI**

| | |
|---|---|
| WARREN YOSHIMOTO, KRISTIN BARROGA, SEAN KETTLEY, CAROLYN FJORD, DON FREELAND, DON FRY, BILL RUBINSOHN, and CLYDE D. STENSRUD,<br><br>    Plaintiffs,<br><br>  v.<br><br>ALASKA AIRLINES, INC. and ALASKA AIR GROUP, INC.,<br><br>    Defendants. | Case No. 1:24-cv-00173-DKW-WRP<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(b)(1) AND RULE 12(b)(6)**<br><br>The Honorable Derrick K. Watson |

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ............................................3

    I.     About Alaska Airlines ...............................................................3

    II.    About Hawaiian Airlines ...........................................................4

    III.   The commercial airline industry is highly competitive...............5

    IV.   The merger will combine complementary networks, increase
consumer choice, and make the airlines more competitive........................7

    V.    Plaintiffs sue to block the Alaska/Hawaiian transaction .............................8

LEGAL STANDARD.............................................................................................9

ARGUMENT .........................................................................................................9

    I.     Plaintiffs do not establish standing under Article III or
Section 16 of the Clayton Act ..................................................................10

    II.    Plaintiffs do not plausibly allege that the merger violates
Section 7 of the Clayton Act ....................................................................17

         A.    Plaintiffs' proposed relevant markets are implausible
and conflict with settled law.................................................17

         B.    Plaintiffs cannot plausibly allege that the merger would
substantially lessen competition in markets in which
Alaska Airlines does not fly .................................................23

CONCLUSION......................................................................................................26

CERTIFICATE OF COMPLIANCE....................................................................28

## TABLE OF AUTHORITIES

**Cases**

*Arcell v. JetBlue Airways Corp.*,
    2024 WL 1878171 (1st Cir. 2024) ........................................................8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................................9, 19

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) ........................................................................21

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..........................................................................9

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
    182 F.3d 1096 (9th Cir. 1999) ........................................................20

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ........................................................................11

*California v. Sutter Health Sys.*,
    130 F. Supp. 2d 1109 (N.D. Cal. 2001) ..........................................24

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986) ........................................................................11

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .................................................................. 11, 15

*Concord Assocs. L.P. v. Entm't Props. Tr.*,
    817 F.3d 46 (2d Cir. 2016) ..............................................................19

*Coronavirus Reporter v. Apple, Inc.*,
    85 F.4th 948 (9th Cir. 2023) ...........................................................19

*Ctr. for Biological Diversity v. Bernhardt*,
    946 F.3d 553 (9th Cir. 2019) ..........................................................10

*Daniel v. Nat'l Park Serv.*,
    891 F.3d 762 (9th Cir. 2018) ..........................................................11

# TABLE OF AUTHORITIES
## (continued)

*DeHoog v. Anheuser-Busch InBev SA/NV*,
   899 F.3d 758 (9th Cir. 2018)............................................................. 17, 24, 25, 26

*DeMartini v. Microsoft Corp.*,
   662 F. Supp. 3d 1055 (N.D. Cal. 2023) .................................................. 12, 13, 15

*DeMartini v. Microsoft Corp.*,
   2023 WL 4239653 (N.D. Cal. 2023) ............................................... 10, 11, 12, 13

*Dutta v. State Farm Mut. Auto. Ins. Co.*,
   895 F.3d 1166 (9th Cir. 2018) .............................................................................10

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992)...............................................................................................18

*Estavillo v. Blizzard Entm't, Inc.*,
   2019 WL 6612061 (N.D. Cal. 2019) ....................................................................3

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
   433 F. App'x 598 (9th Cir. 2011) ........................................................................18

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) ..................................................................... 18, 21

*In re AMR Corp.*,
   2023 WL 2563897 (2d Cir. 2023)........................................................................8

*In re AMR Corp.*,
   527 B.R. 874 (Bankr. S.D.N.Y. 2015)........................................................ 22, 23

*Jones v. L.A. Cent. Plaza LLC*,
   74 F.4th 1053 (9th Cir. 2023) ...............................................................................9

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ..............................................................................9

*M.A.P. Oil Co. v. Texaco Inc.*,
   691 F.2d 1303 (9th Cir. 1982) ............................................................................18

## TABLE OF AUTHORITIES
### (continued)

*Malaney v. UAL Corp.*,
    2010 WL 3790296 (N.D. Cal. 2010) ...................................................22

*Malaney v. UAL Corp.*,
    2011 WL 6845773 (N.D. Cal. 2011) ...................................................22

*Malaney v. UAL Corp.*,
    434 F. App'x 620 (9th Cir. 2011) ............................................... 21, 22

*Malaney v. UAL Corp.*,
    552 F. App'x 698 (9th Cir. 2014) ........................................................8

*Marion HealthCare, LLC v. S. Ill. Hosp. Servs.*,
    2022 WL 2317303 (S.D. Ill. 2022) ....................................... 14, 15, 16

*Marion HealthCare, LLC v. S. Ill. Hosp. Servs.*,
    2022 WL 18027512 (S.D. Ill. 2022) ........................................... 14, 15

*Newcal Indus., Inc. v. IKON Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ..........................................................18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)..............................................................18

*Shred-It Am., Inc. v. MacNaughton*,
    2011 WL 1842997 (D. Haw. 2011) ...................................................20

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
    778 F.3d 775 (9th Cir. 2015)........................................... 17, 18, 19, 24

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007)...............................................................3

*Taleff v. Sw. Airlines Co.*,
    554 F. App'x 598 (9th Cir. 2014) .......................................................8

*United States v. Baker Hughes, Inc.*,
    908 F.2d 981 (D.C. Cir. 1990) .........................................................24

## TABLE OF AUTHORITIES
### (continued)

*United States v. El Paso Nat. Gas Co.*,
   376 U.S. 651 (1964) ............................................................. 26

*United States v. Falstaff*,
   410 U.S. 526 (1973) ............................................................. 25

*United States v. JetBlue Airways Corp.*,
   — F. Supp. 3d —, 2024 WL 162876 (D. Mass. 2024) ....................... 21

*United States v. Marine Bancorporation, Inc.*,
   418 U.S. 602 (1974) ............................................................. 26

*United States v. Penn-Olin Chem. Co.*,
   378 U.S. 158 (1964) ............................................................. 25

*Whalen v. Albertsons Cos. Inc.*,
   2023 WL 8812882 (N.D. Cal. 2023) ........................................... 16

**Statutes**

15 U.S.C. § 18 .................................................................... 9, 17

**Treatises**

Areeda & Hovenkamp, *Antitrust Law* (2024 rev. ed.) ......................... 18

# INTRODUCTION

Alaska Airlines' proposed merger with Hawaiian Airlines is a win for consumers, competition, and the State of Hawai'i.[1] Both carriers offer high-quality flight experiences at competitive prices, and that will not change. Building on the airlines' shared customer-centric ethos, the combined carrier will offer travelers far more choices than either airline could alone. Because Alaska's and Hawaiian's networks are highly complementary—only three percent of their routes overlap—the merger will vastly expand their customers' access to the rest of the world. What does that mean for the people of Hawai'i? For one, it means being able to fly to nearly three times as many destinations as Hawaiian Airlines can reach on its own. And it means the airline industry's giants will have to compete that much harder.

Alaska recognizes how much Hawaiian means to the people of Hawai'i. Far from squelching Hawaiian's Aloha spirit, this merger will make sure that it endures. Not only has Alaska promised to maintain the Hawaiian brand, it also committed to investing in and creating new opportunities for Hawaiian's workforce while continuing Hawaiian's legacy of service to the local community.

Plaintiffs identify themselves as airline passengers, though they do not claim any connection to Alaska or Hawaiian. Most of them are also serial litigants who

---

[1] This motion refers to Defendants Alaska Airlines, Inc. and Alaska Air Group, Inc. collectively as "Alaska Airlines" or "Alaska," and to nonparty Hawaiian Airlines, Inc. as "Hawaiian Airlines" or "Hawaiian."

have challenged nearly every airline merger in recent history, albeit without success. Recycling the same boilerplate allegations they have directed at other airline mergers, Plaintiffs allege that this merger violates Section 7 of the Clayton Act and seek to enjoin the transaction under Section 16 of that statute.

The Court should dismiss Plaintiffs' Complaint (Dkt. 1) for three independent reasons.

*First*, Plaintiffs do not plead facts establishing Article III or antitrust standing—twin requirements that private antitrust plaintiffs must satisfy. Plaintiffs do not claim the merger threatens them with any concrete, particularized, and impending harm, as the law requires. In fact, the Complaint is silent on whether any Plaintiff has flown, or intends to fly, Alaska or Hawaiian. Plaintiffs say the merger threatens to harm "the public at large," but neither Article III nor the Clayton Act affords standing for that kind of generalized grievance.

*Second*, Plaintiffs do not define a plausible relevant market, as required in every Section 7 case. They propose three markets: flights between Hawaiʻi and the U.S. mainland, interisland flights within Hawaiʻi, and flights between Hawaiʻi and the Asia/Pacific region. Not only do Plaintiffs neglect to support those markets with factual allegations, they ignore case law—including from cases they themselves brought—holding that passenger airline markets generally should be defined in terms of specific origin-and-destination pairs.

*Third*, even if Plaintiffs' proposed markets were cognizable, Plaintiffs cannot plead anticompetitive effects in them. For the alleged interisland and Asia/Pacific markets in particular, the reason is straightforward and indisputable: Alaska does not fly any of those routes, so the merger will not impact—let alone substantially lessen—competition in either purported market.

For these reasons, the Court should dismiss the Complaint in full.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    About Alaska Airlines.

Alaska Airlines traces its history to the 1930s, when McGee Airways and Star Air Service combined operations in Anchorage.[2] From the start, Alaska distinguished itself through superior service, competitive fares, and gradual but strategic expansion. Alaska offers a high-value product, ranks highly on on-time arrivals, and often offers lower fares than major airlines. Compl. ¶¶ 52, 90-91.

Alaska has grown in the past 90 years—operating along the West Coast with service to many large- and medium-sized cities across the Midwest and the Eastern seaboard, Alaska now flies to more than 120 destinations. *Id.* ¶¶ 81, 104.[3] But

---

[2] Historical Overview, https://www.alaskaair.com/content/about-us/history. *See Estavillo v. Blizzard Entm't, Inc.*, 2019 WL 6612061, at *2 (N.D. Cal. 2019) (judicially noticing "general information" on defendant's website).

[3] Alaska Air Group Investor Presentation 9, 23 (Dec. 3, 2023) ("AAG Deck") (cited at Compl. ¶ 104), https://investor.alaskaair.com/static-files/b576ec5f-3b6c-4ae5-8b52-9606195cbd43. *See Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (on a motion to dismiss, "a court may consider a writing referenced in the

Alaska remains a David among the Goliaths that comprise the "Big Four":
American, United, Delta, and Southwest. *Id.* ¶¶ 50-51. Case in point: in June 2023,
*each* of the Big Four offered 15-20 million departing one-way seats in the United
States, while Alaska had fewer than five million. *Id.* ¶ 51. Collectively, the Big
Four account for as much as *84 percent* of the country's airline capacity. *Id.* ¶ 50.

Alaska began flying to Hawaiʻi in 2007. *Id.* ¶ 89. It currently flies 24
nonstop routes between Hawaiʻi and the mainland, but does not fly interisland. *Id.*
¶¶ 7, 12, 114. Nor does Alaska offer service to the Asia/Pacific region. *Id.* ¶ 20.

## II.   About Hawaiian Airlines.

Since its founding in 1929, "Hawaiian Airlines has been a source of pride
for the State of Hawaiʻi." *Id.* ¶ 8. For its first decade, the airline shuttled residents
and visitors between the Hawaiian islands. *Id.* In 1941, it became the first
commercial airline to offer service between Hawaiʻi and the U.S. mainland. *Id.* As
Hawaiʻi's largest private employer, Hawaiian now operates 170 daily interisland
flights, flies nonstop to 15 destinations on the U.S. mainland, and provides long-
haul service to cities throughout Asia and the South Pacific. *Id.* ¶¶ 7, 9, 78, 80.
Hawaiian's fleet includes wide-body aircraft configured with lie-flat seats, offering

---

complaint but not explicitly incorporated therein if the complaint relies on the
document and its authenticity is unquestioned").

passengers a premium long-haul travel experience. *Id.* ¶ 57. And every one of Hawaiian's scheduled flights starts or ends its journey in Hawai'i. *Id.* ¶ 64.

Hawaiian's "hugely visible brand" "embodies the culture and spirit of its origin State." *Id.* ¶¶ 7, 10. Passengers enjoy Hawaiian's "[i]sland-inspired" meals, snacks and gifts from the "pau hana cart," and "the aloha spirit of the crew." *Id.* ¶¶ 7, 56. On top of it all, Hawaiian leads the industry in on-time arrivals and offers high-quality service. *Id.* ¶¶ 56, 90-91. It is no wonder that Hawaiian's customers are so loyal. *Id.* ¶ 56.

But Hawaiian is just the tenth largest U.S. airline. *Id.* ¶ 125. And it has faced significant headwinds in recent years. The COVID-19 pandemic hit Hawai'i hard; as travel restrictions took effect around the globe, the number of visitors plummeted. *Id.* ¶¶ 69-70. While "Hawaiian avoided large numbers of layoffs," *id.* ¶ 69, the pandemic took a toll on its business. *See* AAG Deck 27 (Hawaiian's net income dropped from $305 million in 2019 to negative $294 million in 2022). In 2022, Hawaiian carried 2.4 million fewer passengers than it did in 2018. *Id.* ¶¶ 65, 75.

## III.   The commercial airline industry is highly competitive.

Alaska and Hawaiian face stiff competition. First and foremost, the "legacy" carriers—American, Delta, and United—compete across the country, offering "multiple classes of service and a broad range of amenities." *Id.* ¶ 37. Then there

are low-cost carriers (LCCs) like Southwest, JetBlue, and Sun Country, which charge lower fares but typically offer fewer amenities and a single class of service. *Id.* ¶¶ 37, 47.[4] And ultra-low-cost carriers (ULCCs) like Spirit, Allegiant, and Frontier have grown into significant competitive forces in their own right by "offering travelers even lower fares." *Id.* ¶¶ 37, 52.

Many of these airlines fly the same routes as Alaska or Hawaiian. Each of the Big Four flies between Hawaiʻi and the U.S. mainland; they collectively account for about 60 percent of seat capacity on those routes, with United holding the largest share (23.5 percent). *Id.* ¶¶ 7, 53-54.[5] On interisland routes, fliers can choose between Hawaiian, Southwest, or Mokulele Airlines. *Id.* ¶ 114.[6] Hawaiian may fly "key routes to Asia and the Pacific," but it is not alone in doing so (though Alaska does not serve those routes at all). *Id.* ¶¶ 11, 20.

The fact that "any major existing airline has the capability to enter *any market* throughout the United States" further "constrains airfares and services." *Id.* ¶ 111 (emphasis added). When Southwest began flying interisland, for example, it

---

[4] Plaintiffs describe Southwest as both an LCC and one of the "four behemoths." Compl. ¶¶ 40, 45. They also label JetBlue as both an LCC and a "Low Fair [*sic*] Premium Product Carrier[]." *Id.* ¶¶ 37, 52.

[5] The Complaint suggests that Sun Country and Kaiser Air fly between Hawaiʻi and the U.S. mainland as well. *See* Compl. ¶ 54.

[6] *See* Hawaiian Airlines 2022 Economic Impact Report 13 (Feb. 10, 2023) (cited at Compl. ¶ 72), https://issuu.com/hoike/docs/ha-economic-impact-report-02-23 (recognizing that Mokulele Airlines flies interisland).

undercut Hawaiian's prices and quickly secured about one-third of the business on those routes. *Id.* ¶¶ 56, 114. This ever-present threat from expansion by rival carriers keeps airlines on their toes. *Id.* ¶ 111.

**IV.   The merger will combine complementary networks, increase consumer choice, and make the airlines more competitive.**

Late last year, Alaska and Hawaiian announced their intention to merge. It is a winning combination. Since the airlines' networks are almost completely complementary—their routes overlap by just three percent (AAG Deck 9)—the transaction will enable passengers to reach more places without having to change airlines. The merged carrier's 1,300-plus daily departures will serve 138 unique destinations. *Id.* For fliers departing from Hawai'i, that is a nearly *threefold* increase over what Hawaiian offers. *Id.* at 9, 12. Since "Hawai'i depends almost entirely on air travel for its residents, visitors, and economy," Compl. ¶ 2, multiplying its connections with the rest of the country will inure to its benefit.

The airlines only overlap on a small number of routes between Hawai'i and the U.S. mainland, *id.* ¶ 7, and competing airlines fly nonstop on nearly all of them, *id.* ¶ 95. Even on Hawai'i-to-mainland routes, the airlines' networks are mostly complementary: outside of the overlap, Hawaiian flies 15 other routes to the mainland and Alaska flies 12 more. *Id.* ¶¶ 92-93.

Because Alaska understands Hawaiian's economic and cultural significance, Alaska promised to maintain Hawaiian's brand. *Id.* ¶ 123. Not only that, Alaska

committed to keep (and grow) union jobs in Hawaiʻi; preserve Hawaiian's pilot, flight attendant, and maintenance bases at Daniel K. Inouye International Airport (HNL); and retain a regional headquarters in Hawaiʻi. AAG Deck 19. Alaska fully intends for Hawaiian to remain the "top local employer." *Id.* at 20.

The Big Four juggernauts currently eclipse Alaska and Hawaiian, and that will continue to be true after the merger. The combined airline will have only about one-third the seating capacity of United, a giant in its own right but the smallest of the Big Four. Compl. ¶ 51.

## V.   Plaintiffs sue to block the Alaska/Hawaiian transaction.

On April 15, 2024, eight Plaintiffs filed this lawsuit to enjoin the Alaska/Hawaiian merger under Section 7 of the Clayton Act. The Complaint says little about Plaintiffs, but they are no strangers to litigation. Plaintiffs Fjord, Freeland, Fry, Rubinsohn, and Stensrud challenged the United/Continental, Southwest/AirTran, and American/US Airways mergers, and four of those Plaintiffs challenged JetBlue/Spirit. None of those lawsuits succeeded.[7]

---

[7] *Arcell v. JetBlue Airways Corp.*, 2024 WL 1878171 (1st Cir. 2024) (dismissing plaintiffs' appeal as moot); *In re AMR Corp.*, 2023 WL 2563897 (2d Cir. 2023) (affirming judgment for defendants), *cert. denied sub nom. Fjord v. Am. Airlines Grp., Inc.*, 144 S. Ct. 102 (Oct. 2, 2023); *Taleff v. Sw. Airlines Co.*, 554 F. App'x 598 (9th Cir. 2014) (affirming dismissal); *Malaney v. UAL Corp.*, 552 F. App'x 698 (9th Cir. 2014) (affirming dismissal).

## LEGAL STANDARD

To survive dismissal, Plaintiffs must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). Mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, plaintiffs must allege sufficient "evidentiary facts," *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008), to permit a "reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). This same standard applies to allegations supporting Article III standing. *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1056 (9th Cir. 2023).

## ARGUMENT

Judging from their litigation history, several of these Plaintiffs appear to object to mergers of any kind. They are entitled to that objection—but it does not mean they have an antitrust case against Alaska. This Court is not a forum for airing generalized grievances, nor is the Clayton Act an instrument for implementing Plaintiffs' preferred industrial policy. To proceed, Plaintiffs must plead facts demonstrating Article III and antitrust standing. They must also plausibly allege that the effect of this merger "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

Plaintiffs do not satisfy any of these prerequisites, much less all of them. For the reasons that follow, the Court should dismiss the Complaint in full.

## I.     Plaintiffs do not establish standing under Article III or Section 16 of the Clayton Act.

Plaintiffs do not carry either facet of their twofold burden on standing. First, Plaintiffs must show that they have Article III standing. At this stage, that means they must plead facts plausibly establishing (1) an "injury in fact," (2) a "causal connection between the injury and the conduct complained of," and (3) that it is "likely … that the injury will be redressed by a favorable decision." *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1173 (9th Cir. 2018) (cleaned up).

As another court overseeing a private merger challenge recently emphasized, the alleged injury-in-fact must be "both concrete and particularized and actual or imminent, not conjectural or hypothetical." *DeMartini v. Microsoft Corp.* (*DeMartini II*), 2023 WL 4239653, at *1 (N.D. Cal. 2023) (cleaned up). An injury is *particularized* if it "affect[s] the plaintiff in a personal and individual way," and an injury is *concrete* if it is "real and not abstract or purely procedural." *Id.* (cleaned up). If the plaintiff's factual allegations do not "nudge[] its claim of injury across the line from conceivable to plausible," the court must dismiss for lack of subject-matter jurisdiction. *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 560 (9th Cir. 2019) (cleaned up).

Private antitrust plaintiffs must overcome a second hurdle—antitrust standing. Those suing for injunctive relief under the Clayton Act "must allege threatened loss or damage of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986). A threatened injury is one that is "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013), and "[t]he threatened loss or damage must be personal to the private plaintiff," *DeMartini II*, 2023 WL 4239653, at *1. Only losses that stem from an anticompetitive effect of the merger can confer antitrust standing. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

This means Plaintiffs must adequately plead that the Alaska/Hawaiian merger threatens to inflict upon them a concrete, particularized, certainly impending, and personalized injury. And they must plausibly allege that this threatened injury stems from a competition-reducing aspect or effect of the merger. That requires "specific factual allegations"; Plaintiffs cannot "rely on … bare legal conclusion[s] to assert injury-in-fact, or engage in an ingenious academic exercise in the conceivable to explain how defendants' actions caused [their] injury." *See Daniel v. Nat'l Park Serv.*, 891 F.3d 762, 767 (9th Cir. 2018).

Beyond a few naked assertions, Plaintiffs never even attempt that showing. They do not allege that they have flown on Hawaiian or Alaska, much less in the

11

markets they claim are relevant to this case. Nor do they allege any concrete plans to fly on either airline in the future. The Complaint suggests some Plaintiffs are "former travel agents," Compl. ¶ 27, without ever explaining why that matters.

Instead, Plaintiffs assert that they are "airline passenger[s]" who—along with "the public at large"—may lose "the salutary benefits of the competition that Hawaiian brings, as well as the opportunity to fly and continue to fly on Hawaiian." *Id.* ¶ 27. The Complaint later posits a parade of horribles that supposedly threaten "Plaintiffs and all consumers," *id.* ¶ 129, without ever alleging facts that would make those harms plausible or place Plaintiffs within the class of those threatened by them. But Plaintiffs' core injury allegation is that "the proposed elimination of Hawaiian by Defendant Alaska constitutes a substantial threat of injury to [them] because the acquisition may have the effect substantially to lessen competition and tend to create a monopoly in various markets." *Id.* ¶ 33.

Courts routinely reject similarly threadbare allegations in support of Article III and antitrust standing. In a recent challenge to Microsoft's acquisition of videogame developer Activision, the district court did so twice. *DeMartini v. Microsoft Corp.* (*DeMartini I*), 662 F. Supp. 3d 1055, 1061 (N.D. Cal. 2023); *DeMartini II*, 2023 WL 4239653. In its first order, the court rejected the plaintiffs' claim that the acquisition threatened to injure them by "substantially reduc[ing] competition in the labor market for video game labor talent." No. 3:22-cv-08991-

JSC (N.D. Cal. Dec. 20, 2022), Dkt. 1 ¶ 224. Plaintiffs argued that they could establish a threatened labor injury simply by pleading that the acquisition would "substantially reduce competition in the video game industry," without alleging "a direct connection to each of the numerous products or markets that may be impacted." *Id.*, Dkt. 61 at 21-23. The district court disagreed. It held that Article III obligated the plaintiffs to plead a personalized injury stemming from "anticompetitive effects in the labor market," and that plaintiffs "cite[d] nothing to support th[eir] argument" to the contrary. *DeMartini I*, 662 F. Supp. 3d at 1061.

After the plaintiffs amended their complaint, Microsoft again moved to dismiss for lack of standing. This time Microsoft argued that, notwithstanding their allegation of threatened exposure to higher videogame prices resulting from the merger, the plaintiffs did "not plausibly allege when and if they w[ould] purchase any future Activision games," rendering "their future injuries too speculative to support Article III standing." *DeMartini II*, 2023 WL 4239653, at *2. The court agreed. It explained that the complaint merely alleged that each plaintiff *currently* played Activision's games that "enable[d] some (unidentified) [p]laintiffs to stay connected with family and friends." *Id.* at *2 (cleaned up). Those allegations, the court held, were too conclusory to support an inference that the merger exposed

plaintiffs to a threatened price injury on *future* Activision game purchases, or

would otherwise coerce plaintiffs into purchasing a Microsoft gaming system.[8]

A different court recently reached the same conclusion in another private

merger challenge. *Marion HealthCare, LLC v. S. Ill. Hosp. Servs.* (*Marion I*), 2022

WL 2317303 (S.D. Ill. 2022); *Marion HealthCare, LLC v. S. Ill. Hosp. Servs.*

(*Marion II*), 2022 WL 18027512 (S.D. Ill. 2022). Marion Hospital sued to enjoin a

proposed merger between competing hospitals under Section 7 of the Clayton Act.

It posited a series of threatened injuries,[9] but the court found the relevant

allegations "conclusory and hypothetical." *Marion I*, 2022 WL 2317303, at *3.

Undeterred, Marion argued that "the illegality of the merger itself [was] enough to

give rise to the kinds of injury-in-fact that it allege[d]." *Id.*

The district court dismissed Marion's complaint for lack of Article III and

antitrust standing. *Id.* at *3-5. The court held that Marion's conclusory pleadings

did not suggest that Marion faced any plausible exposure to a concrete injury

resulting from the merger, as Article III required. *Id.* at *3. And the court rejected

---

[8] The court ultimately held that the plaintiffs established Article III standing only because they submitted declarations in a *separate* filing (a motion for a preliminary injunction) that supported a plausible inference of threatened price injury.

[9] *Marion I*, 2022 WL 2317303, at *3 (cataloguing Marion's asserted injuries, "including increased prices to patients, a reduction of choice of institutional providers and physicians, reduced referrals suppressing Marion's ability to compete, and the like").

Marion's bootstrapping argument—that pleading an illegal merger necessarily confers antitrust standing on a private plaintiff suing under Section 16. *Id.* at *5. The court emphasized that "proof of an antitrust violation and of antitrust injury are distinct matters that must be shown independently." *Id.* at *5 (cleaned up). And it concluded that Marion could not "adequately establish[] proximate causation as the suitable plaintiff" merely by asserting that "it and the public at large w[ould] be injured and financially damaged" by the merger "in amounts yet to be determined." *Id.* at *5 (cleaned up).[10]

   *DeMartini* and *Marion* underscore the shortcomings in Plaintiffs' injury allegations. Here, as in *Marion*, Plaintiffs rely on conclusory assertions rather than well-pleaded facts to allege a yard sale of speculative injuries. *Compare Marion I*, 2022 WL 2317303, at *3 (rejecting conclusory allegations of threatened injury in the form of higher prices, fewer consumer choices, and diminished output), *with* Compl. ¶ 129 (same allegations). And here, as in *DeMartini*, the Complaint omits the facts necessary to show that those effects—even if Plaintiffs adequately pleaded them—personally threatened Plaintiffs with impending injury. *See* 662 F. Supp. 3d at 1061; *see also Clapper*, 568 U.S. at 401.

_____

[10] The court later dismissed Marion's claims with prejudice, again because Marion "fail[ed] to provide factual support to show injury to itself" or plausibly allege the "acquisition proximately caused its presumed antitrust injury." *Marion II*, 2022 WL 18027512, at *3-4.

Similarly, the bootstrapping argument fares no better here than it did in

*Marion*. *Compare Marion I*, 2022 WL 2317303, at *5 (rejecting the argument that

"the illegality of the merger itself [w]as enough to give rise to the kinds of injury

in-fact that [it] allege[d]") (cleaned up), *with* Compl. ¶ 33 (asserting that "the

proposed elimination of Hawaiian by Defendant Alaska [itself] constitutes a

substantial threat of injury" for standing purposes).[11] Nor can Plaintiffs succeed by

alleging a generalized and speculative injury that they share with "the public at

large." *Compare Marion I*, 2022 WL 2317303, at *5 (rejecting unsupported

allegations that Marion "and the public at large w[ould] be injured and financially

damaged" by the merger), *with* Compl. ¶ 23 ("The 'threatened loss or damage' to

Plaintiffs and to the public at large by the elimination of Hawaiian as a competitor

in the market is substantial and foreboding.").

Plaintiffs' standing problems are commensurate with, if not more serious

than, their counterparts' in *DeMartini* and *Marion*. This Court should apply the

lessons of those cases and dismiss this Complaint for lack of subject-matter

jurisdiction and for failure to adequately allege antitrust standing.

---

[11] *See also Whalen v. Albertsons Cos. Inc.*, 2023 WL 8812882, at *1 (N.D. Cal. 2023) (dismissing complaint brought by several of these same Plaintiffs for lack of Article III standing, finding that Plaintiffs' allegations about "whether competition will be adversely affected in general" ignored "the threshold question of whether these individual plaintiffs will be harmed in particular").

**II.     Plaintiffs do not plausibly allege that the merger violates Section 7 of the Clayton Act.**

A plaintiff invoking Section 7 of the Clayton Act must "first establish a prima facie case that a merger is anticompetitive." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015). Because Section 7 only condemns transactions the effect of which "may be substantially to lessen competition, or tend to create a monopoly," 15 U.S.C. § 18, pleading a claim under that statute "means adequately alleging facts that an acquisition creates an appreciable danger or a reasonable probability of anticompetitive effects in the relevant market." *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018) (cleaned up).

Plaintiffs have not carried their burden. To begin, Plaintiffs do not adequately plead a plausible relevant market, and their approach contravenes the ordinary practice in antitrust cases involving airlines. If that weren't enough, Plaintiffs' theory that the merger will substantially lessen competition—even in markets in which Alaska does not compete—is wrong as a matter of law. The Court should dismiss the Complaint for failure to state a claim.

**A.     Plaintiffs' proposed relevant markets are implausible and conflict with settled law.**

Defining a plausible relevant market is a "necessary predicate to deciding whether a merger contravenes the Clayton Act." *St. Alphonsus*, 778 F.3d at 783

(cleaned up); *see Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, 433 F. App'x 598, 598-99 (9th Cir. 2011) (affirming dismissal of Section 7 claim for failure to plead a plausible market). Market definition entails "both a geographic market and a product market." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018). Whereas the product market comprises "the product at issue as well as economic substitutes for the product," *id.* (cleaned up), the geographic market refers to "the area of effective competition where buyers can turn for alternative sources of supply," *St. Alphonsus*, 778 F.3d at 784 (cleaned up).

"Market definition can be broadly characterized in terms of 'cross-elasticity of demand' for or 'reasonable interchangeability' of a given set of products or services." *M.A.P. Oil Co. v. Texaco Inc.*, 691 F.2d 1303, 1306 (9th Cir. 1982) (cleaned up).[12] If a plaintiff "fails to define a proposed market with reference to the rule of reasonable interchangeability and cross-elasticity of demand," *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37 (3d Cir. 1997), or if the proposed market is otherwise "facially unsustainable," *Newcal Indus., Inc. v. IKON Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008), dismissal is warranted. *See, e.g.*,

---

[12] Cross-elasticity measures "the extent to which consumers will change their consumption of one product in response to a price change in another." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 (1992). For example, if the sole gas station in a town raises prices and consumers respond by buying gas in an adjacent city, the town and city belong in the same geographic market. *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 550a2 (2024 rev. ed.).

*Concord Assocs. L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 52-55 (2d Cir. 2016) (affirming dismissal of antitrust claims where plaintiffs failed to define geographic market by reference to interchangeability and cross-elasticity).

Plaintiffs do not plead any plausible relevant market. They assert that the relevant product market here is "scheduled air passenger service,"[13] and that there are three relevant geographic markets: (1) flights between Hawaiʻi and the U.S. mainland (the Mainland market); (2) Hawaiʻi interisland flights (the Interisland market); and (3) flights between Hawaiʻi and the Asia/Pacific region (the Asia/Pacific market). Compl. ¶¶ 110-12. Though the Complaint repeatedly *refers to* these proposed markets, *e.g.*, *id.* ¶¶ 7, 12, 16-21, 110-12, there are no *factual allegations* making those markets plausible.

Plaintiffs must plead enough "factual matter," *Iqbal*, 556 U.S. at 678, to show that their proposed markets delineate geographies in which buyers plausibly "can turn for alternate sources of supply," *St. Alphonsus*, 778 F.3d 784 (cleaned up). Yet the Complaint does not even mention reasonable interchangeability or cross-elasticity, much less plead facts satisfying those market-definition touchstones. That is fatal. *See Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 956 (9th Cir. 2023) (affirming dismissal of antitrust claims because complaint did

---

[13] Alaska does not agree that Plaintiffs adequately allege this product market, but for current purposes, accepts that market at face value.

not address cross-elasticity, "as it must"), *cert. denied*, 144 S. Ct. 1054 (Mar. 18, 2024); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999) (affirming dismissal where plaintiff failed to plead that there were "no other goods or services that are reasonably interchangeable … within [the alleged] geographic market").

This calls to mind the pleading that Judge Ezra found deficient in *Shred-It America, Inc. v. MacNaughton*, 2011 WL 1842997 (D. Haw. 2011). The complaint there was "utterly devoid of any explanation or elaboration to support" the plaintiffs' proposed market. *Id.* at *5. It made no "allegations concerning economic substitutes," and in fact, the plaintiffs did not even "explain why [it] defined the relevant antitrust market in the way that it did." *Id.* The court dismissed the complaint for failure to plead a plausible relevant market. *Id.* at *6.

This Complaint fares no better. Like their counterparts in *Shred-It*, Plaintiffs do not make "any allegations concerning economic substitutes" or explain "why [they] define[] the relevant market[s]" the way they do; their naked assertion of three geographic markets is "nothing more than [a] legal conclusion." *See id.* at *5-6. As Judge Ezra pointed out, "'a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" *Id.* at *6 (quoting *Associated Gen. Contractors of Cal.*,

*Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983)). These

Plaintiffs' relevant-market allegations never even aspire to specificity.

Of course, the problem is not *just* an absence of facts. Under a body of law

that Plaintiffs helped make, their proposed geographic markets are "facially

unsustainable" as a matter of law. *See Hicks*, 897 F.3d at 1120 (quotation omitted).

The court in *United States v. JetBlue Airways Corp.*, — F. Supp. 3d —, 2024 WL

162876 (D. Mass. 2024), recently observed that origin-and-destination (O&D)

pairs have "[h]istorically … been considered relevant geographic markets for

evaluating competition between airlines in the market for scheduled air passenger

service." *Id*. at *25 (collecting cases). As that court explained, "consumers

originating in one metropolitan area … would not consider it a viable alternative to

purchase a scheduled air passenger service between a different origin-and-

destination pair." *Id.* (cleaned up). A traveler flying from Los Angeles would not

consider a flight originating in Portland to be a viable alternative.

One of the cases the *JetBlue* court relied upon was *Malaney v. UAL Corp.*,

434 F. App'x 620 (9th Cir. 2011), a case in which several of these same Plaintiffs

challenged United's merger with Continental Airlines. *Id.* at 621. The district court

denied Plaintiffs' motion for a preliminary injunction in part because their

proposed market—which was national in scope—was not viable. *Malaney v. UAL*

21

*Corp.*, 2010 WL 3790296, at *12 (N.D. Cal. 2010).[14] The Ninth Circuit agreed, noting that "a flight from San Francisco to Newark is not interchangeable with a flight from Seattle to Miami." 434 F. App'x at 621. In contrast, the court held, the "city-pair" (or O&D-pair) approach "satisf[ied] the reasonable interchangeability standard" and had "been endorsed as the most appropriate market for antitrust analysis by all academics and government agencies in the record." *Id.* ; *see also Malaney v. UAL Corp.*, 2011 WL 6845773, at *4 (N.D. Cal. 2011) (on remand, dismissing Plaintiffs' complaint because "flights between distant cities are simply not reasonably interchangeable"), *aff'd*, 552 F. App'x 698 (9th Cir. 2014).

This is not an isolated example. In *In re AMR Corp.*, 527 B.R. 874 (Bankr. S.D.N.Y. 2015), several of the same Plaintiffs sued over American's merger with US Airways. That court denied Plaintiffs' motion to amend the pleadings because, among other things, their proposed complaint did not plead a plausible relevant market. *Id.* at 883-84. As here, Plaintiffs "devote[d] little time to the relevant market definition" and failed to make "any allegations about interchangeability and cross-elasticity, which is fatal." *Id.* at 884. They once again urged a "national market for airline travel," and they once again failed. *Id.* at 885. The court wrote that travelers "cannot buy a ticket that acts as a pass for travel anywhere within the

---

[14] The court also rejected a "network carrier market catering to business travelers" and a market of 13 "airport-pairs." 2010 WL 3790296, at *8-11.

country," but "must buy a ticket with a specific origin and destination." *Id.* That is

why "the case law recognizes that city pairs"—not markets comprising broad

swaths of the country—"are an appropriate way to define the market for antitrust

purposes in the airline industry." *Id.* at 886.[15]

The three markets Plaintiffs propose here suffer from the same defects as the

failed markets in their earlier cases. Just like the national markets that the *Malaney*

and *AMR* courts rejected, the alleged Mainland, Interisland, and Asia/Pacific

markets group together flights that are not plausibly interchangeable. Compl. ¶¶ 7,

78-79, 95. No traveler would consider a flight from HNL to Tokyo to be a

substitute for a flight from Kahului to the Cook Islands, yet according to Plaintiffs,

both flights belong in the same market. *Id.* ¶¶ 7, 80. Because these alleged markets

are implausible, factually unsupported, and contravene legal authority, the Court

should dismiss the Complaint.

### B.   Plaintiffs cannot plausibly allege that the merger would substantially lessen competition in markets in which Alaska Airlines does not fly.

Even if Plaintiffs had alleged plausible relevant markets, they would still

need to "adequately alleg[e] facts" showing that the merger "creates an appreciable

danger or a reasonable probability of anticompetitive effects" in those markets.

---

[15] The court also reasoned that if the complaint could be read as identifying a city-pair market, that market would still "suffer from the flaw of not alleging cross-elasticity and interchangeability." 527 B.R. at 887. The same is true here.

*DeHoog*, 899 F.3d at 763 (cleaned up). At minimum, this requires factual allegations "that the transaction will lead to undue concentration in the market." *California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1118 (N.D. Cal. 2001) (citing *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982 (D.C. Cir. 1990)).[16] Plaintiffs do not, and cannot, allege any increase in concentration within the alleged Asia/Pacific and Interisland markets because Alaska does not compete in those markets. *See* Compl. ¶ 20 (alleging that Alaska does not fly to Asia or the Pacific); *id.* ¶¶ 12, 114 (alleging that Hawaiian and Southwest are the only "two carriers that provide interisland flights").

The Ninth Circuit's decision in *DeHoog* explains the root of this problem. There, consumers challenged Anheuser-Busch InBev's (ABI) acquisition of SABMiller (SAB). 899 F.3d at 760. Per a settlement with the Department of Justice, ABI had agreed to "divest SAB's entire U.S. business" to another buyer, leaving SAB without a presence in the U.S. beer market. *Id.* at 760-61. The plaintiffs argued that the merger was anticompetitive because it "eliminated SAB as an actual competitor in the United States," *id.* at 763 (cleaned up), but the Ninth

---

[16] "[S]tatistics concerning market share and concentration, while of great significance, are not conclusive indicators of anticompetitive effects." *St. Alphonsus*, 778 F.3d at 785-86 (cleaned up). That is why "plaintiffs in § 7 cases generally present other evidence" of anticompetitive effects, in addition to market shares, "as part of the[ir] prima facie case." *Id.* at 786. Alaska does not agree that Plaintiffs adequately allege likely anticompetitive effects in *any* market.

Circuit disagreed. Since SAB would no longer have *any* share of the U.S. market after the divestiture, the merger "did not increase ABI's [U.S.] market share." *Id.* Save for a change in SAB's ownership, concentration in "the U.S. beer market stayed precisely the same." *Id.* at 763-64. And without any plausible allegation of anticompetitive harm, the plaintiffs had no Section 7 claim. *Id.*

Plaintiffs commit the same error here. Because Alaska does not fly interisland or to the Asia/Pacific region, its merger with Hawaiian will not increase concentration in these alleged markets.[17] Concentration in these purported markets will "stay[] precisely the same," *see id.* at 764: Hawaiian will continue flying in them, just under new ownership. There can be no "reasonable probability of anticompetitive effects" in these markets. *See id.* at 763.

Plaintiffs apparently think Alaska is a *potential* competitor in these markets. *See* Compl. ¶ 117 (citing *United States v. Falstaff*, 410 U.S. 526 (1973)). That argument didn't work in *DeHoog*, and it won't work here. The potential-competitor theory applies only where one of the merging parties was "poised on the edge of the market 'continually threatening to enter'" or "'eager to enter that market.'" *DeHoog*, 899 F.3d at 764 (quoting *United States v. Penn-Olin Chem.*

---

[17] Plaintiffs do not even allege Hawaiian's share of the purported Asia/Pacific market. *See* Compl. ¶ 11 (alleging only that Hawaiian is a "significant provider of key routes to Asia and the Pacific").

*Co.*, 378 U.S. 158, 173 (1964), and *United States v. El Paso Nat. Gas Co.*, 376 U.S. 651, 660 (1964)) (cleaned up). Put another way, the would-be entrant must have the "characteristics, capabilities, and economic incentive to render it a perceived potential *de novo* entrant," such that its "premerger presence on the fringe of the target market in fact tempered oligopolistic behavior on the part of existing participants in that market." *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 624-25 (1974). In *DeHoog*, the Ninth Circuit rejected the plaintiffs' potential-competitor argument because they did not plead any facts that satisfied the doctrine's requirements. 899 F.3d at 764.

The same is true here. Plaintiffs do not plead a single fact suggesting that Alaska "continually threaten[s]" to enter the Interisland or Asia/Pacific markets, *id.* at 764, or that Alaska's "presence on the fringe" of those markets "temper[s]" incumbents' "oligopolistic behavior," *see Marine Bancorporation*, 418 U.S. at 624. Not one allegation.

Plaintiffs' inability to allege anticompetitive harm in their Asia/Pacific and Interisland markets is one more reason to dismiss the Complaint.

## CONCLUSION

For these reasons, the Court should dismiss the Complaint.

Respectfully submitted,                          Dated: May 17, 2024

*/s/ Stephen J. McIntyre*

Stephen J. McIntyre

**O'MELVENY & MYERS LLP**              **BRONSTER FUJICHAKU**
COURTNEY B. DYER                       **ROBBINS**
cdyer@omm.com                          **A Law Corporation**
BRIAN P. QUINN                         MARGERY S. BRONSTER
bquinn@omm.com                         mbronster@bfrhawaii.com
1625 Eye Street, NW                    REX Y. FUJICHAKU
Washington, D.C. 20006                 rfujichaku@bfrhawaii.com
Telephone: (202) 383-5300              1003 Bishop Street, Suite 2300
                                       Honolulu, Hawaiʻi 96813
STEPHEN J. McINTYRE                    Telephone: (808) 524-5644
smcintyre@omm.com
400 South Hope Street                  *Attorneys for Defendants*
Los Angeles, California 90071          *Alaska Airlines, Inc. and*
Telephone: (213) 430-6000              *Alaska Air Group, Inc.*

ANNA T. PLETCHER
apletcher@omm.com
Two Embarcadero Center
San Francisco, California 94111
Telephone: (415) 984-8700

PETER C. HERRICK
pherrick@omm.com
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000

27

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Memorandum in Support of Defendants' Motion to Dismiss complies with the length limitations of Local Rule 7.4(b) because, excluding the parts exempted by Local Rule 7.4(e), the Memorandum contains 6,250 words.


*/s/ Stephen J. McIntyre*
_____
Stephen J. McIntyre

Dated: May 17, 2024